[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 6, 2004
THOMAS K. KAHN
CLERK

No. 03-11316

D.C. Docket No. 99-01223 CV-ASG


AMOCO OIL COMPANY,
a Maryland corporation,

Plaintiff-Counter-
Defendant-Appellee
Cross-Appellant,

versus

CAROLINE GOMEZ,

Defendant-Counter-
Claimant-Appellant
Cross-Appellee.


Appeals from the United States District Court
for the Southern District of Florida


**(August 6, 2004)**

Before TJOFLAT, BARKETT and SILER*, Circuit Judges.

TJOFLAT, Circuit Judge:

In this diversity case, Amoco Oil Company ("Amoco") appeals a damages award in the amount of $205,725 to Caroline Gomez ("Gomez"), a former Amoco franchisee and lessee, on a breach of contract counterclaim.[1] Because the damages Gomez recovered did not flow from Amoco's breach, we reverse.

## I.

## A.

Gomez's dealings with Amoco began in late 1996 when she and her husband, Robert Gomez, approached the company and informed Amoco representatives that they were interested in becoming Amoco "dealers" in Miami, Florida. Amoco put them in contact with James Perez to discuss a convenience store, car wash, and service station located at 7070 West Flagler Street in Miami. The ensuing discussion between the Gomezes and Perez bore fruit, and in March 1997, Robert Gomez, acting as president of Rocabaja Corporation ("Rocabaja"),

---

* Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] The district court originally reduced the jury award by a set off of $11,000 which it ruled Gomez owed Amoco. This brought the total to $194,725. The court subsequently entered an amended judgment adding prejudgment interest in favor of Gomez that increased the total amount of the judgment to $264,805.

purchased the inventory and goodwill of the 7070 West Flagler Street facility from Gemar Service Station, Inc. ("Gemar") for the sum of $220,000. This transaction, however, was "specifically contingent upon the termination of the existing Lease and Dealer Agreement between [the president of Gemar] and Amoco Oil . . . and the ability of [Rocabaja] to negotiate and enter into a Lease Agreement, Dealer Agreement, and Fuel Purchase Agreement with Amoco Oil, under terms acceptable to [Rocabaja] and no less favorable than those between [the president of Gemar] and Amoco Oil." Rocabaja and Amoco were unable to come to terms because Amoco granted franchises only to individuals. The problem was solved, however, when in April 1997, Gomez, acting in lieu of Rocabaja, entered into a Trial Franchise Lease with Amoco that obligated her to operate the 7070 West Flagler Street facility as a prospective Amoco franchisee for a one-year trial period commencing May 12, 1997.

The ink had barely dried on the Trial Franchise Lease, however, before Gomez discovered problems with the station. In June 1997, inspectors from the Miami-Dade Department of Environmental Resource Management ("DERM ") arrived at the site to conduct environmental tests. The tests revealed that the

gasoline station was not in compliance with environmental regulations.[2]  More

revealingly, Gomez learned from one of the DERM inspectors that Amoco had

known about the gasoline station's shortcomings as far back as 1989.  Armed with

this information, Gomez contacted Amoco to report the DERM inspectors'

findings.  Amoco did not deny prior knowledge of the station's environmental

defects but instead explained that extensive, underground construction would be

needed to install a vapor recovery system on site to bring the station into

compliance.  Because Amoco was responsible under the lease for keeping the

station in working order, Amoco paid for the installation.  Gomez, however, was

forced to shut down the business for a month while the underground construction

took place.

Shortly after the new vapor recovery system was installed, Gomez noticed

that the fuel dispensing equipment at the station no longer functioned properly (the

equipment would pump gasoline slowly or stop pumping altogether).  As a result,

customers often complained to Gomez and her employees, resulting in angry

customers, lost sales and, ultimately, a loss of business.  Gomez contacted Amoco

on numerous occasions to express her frustration with the "slow flow problems" at

---

[2]  The environmental tests conducted by DERM revealed that there was soil
contamination on the site caused by leaking gasoline, as well as vapor recovery problems.

her station, and Amoco routinely sent maintenance people over to the station to investigate the matter. Those who were sent to the station were unable to identify the source of the "slow flow problem," however, so the problem remained unsolved. Nevertheless, to counter Gomez's financial losses, Amoco frequently offered Gomez rent waivers and rent incentives which enabled her to reduce her monthly obligations and thus to keep her head above water.

In January 1998, notwithstanding the continuing malfunction of the station's fuel pumps, Gomez and Amoco entered into a three-year Franchise Lease and Dealer Supply Agreement ("Franchise Agreement") governed by the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801-2806 (2004). The Franchise Agreement extinguished and superseded the Trial Franchise Lease and obligated Gomez to operate the 7070 West Flagler Street station from May 12, 1998 until May 31, 2001 at a monthly rent of $7,229.

Notwithstanding the new agreement, the economic situation Gomez faced at the service station persisted. In September 1998, Alex Escardo, an Amoco representative, responded to Gomez's continued complaints about the "slow flow problems" at her station by assuring her that his company was sympathetic to her concerns and wanted to find a way to work out a solution. The solution Escardo eventually proposed would require the parties to cancel the Franchise Agreement

5

and enter into a Commission Marketer Agreement ("CMA") and a Commission Marketer Lease ("CML"). These two agreements would alter the economic, as well as the legal, nature of their relationship.

If the parties entered into the CMA and CML, Gomez would no longer purchase gasoline from Amoco and then resell it to the public at whatever price she deemed appropriate. Instead, Amoco would maintain ownership of the gasoline and would establish the price it would sell for while Gomez would receive a commission on the gasoline she sold.[3] Additionally, under the CMA and CML, Gomez would be obligated to pay approximately $4,300 less in rent (per month) than she had under the Franchise Agreement while Amoco would assume responsibility for many of the costs associated with the upkeep of the station and storage of the gasoline for which Gomez had been responsible under the Franchise Agreement.[4] Finally, if Gomez entered into the CMA and CML, Amoco said that it would approve her for a CMA and CML to operate a second service station, which was located at 10450 West Flagler Street and was more profitable than the 7070 West Flagler Street station. This would enable Gomez to offset her losses

---

[3] The new agreements would obligate Gomez to remit the proceeds of gasoline sales to Amoco, less a 3.4 cents per gallon commission she would keep for herself. In addition, she would be responsible for promptly accounting to Amoco all gross receipts.

[4] Under the three-year Franchise Agreement, Gomez was obligated to pay Amoco $7,229 per month. Under the CMA and CML, the rent would be reduced to $2,960 per month.

6

from the first station until the problems with the fuel dispensing equipment there were remedied. In return for these advantages, however, Gomez, no longer a franchisee, would lose the benefits and protections afforded to franchisees under the PMPA.

In September 1998, Gomez and Amoco cancelled the Franchise Agreement by executing the CMA and CML.[5] In addition to signing these two contracts, Gomez signed a "Mutual Cancellation of the Franchise Lease and Dealer Supply Agreement" that included a summary of PMPA rights available only to franchisees and not to commission marketers, i.e., rights Gomez was losing because the CMA and CML superceded the Franchise Agreement. Gomez also filled out a "Franchise Disclosure Questionnaire," which stated that she had received and personally reviewed the CMA and CML documents with "an attorney, accountant or other professional advisor, and that she understood [the] risks."[6] The CMA and CML incorporated each other by reference; by their terms, the two contracts would govern the parties' relationship for the next four years.

---

[5] Shortly after Gomez entered into the CMA and CML, Fat Man Oil Corporation ("Fat Man Oil"), which Gomez and her husband owned, purchased the inventory and goodwill at the 10450 West Flagler Street station so that she could operate the station at that site.

[6] Gomez had forty-two days to review the CMA, CML, and the cancellation agreement before she signed them. At trial, she contended that she did not fully understand the import of these documents; specifically, she claimed that she was unaware that by entering into these agreements she would forfeit her rights under the PMPA as a franchisee.

Unfortunately, despite Amoco's efforts to repair the malfunctioning fuel dispensing equipment at the 7070 West Flagler Street station, the "slow flow problems" persisted at the first station, and Gomez continued to experience poor sales. Over the next few months, she sustained the 7070 West Flagler Street station with the proceeds she received from sales at her second station, but her losses still mounted.[7] Eventually, Gomez decided that both stations should be "sold."[8] Although she ultimately sold the inventory and goodwill at the second station, the 7070 West Flagler Street station went unsold.[9] In March 1999, Rocabaja having failed to find a buyer for the 7070 West Flagler Street site, Gomez abandoned the station.[10] In the process, she pocketed the entire proceeds from the station's most recent gasoline sales although, under the CMA, she was obligated to remit those proceeds to Amoco less a 3.4 percent commission for

---

[7] Although Gomez had the contractual relationship with Amoco, two separate corporations—Rocabaja and Fat Man Oil—received the financial benefits she gained from the CMAs and CMLs. At trial, she testified that she passed money back and forth between the two companies mainly to offset the losses she was enduring at the 7070 West Flagler Street station.

[8] Gomez did not own the stations; Amoco "owned" them under a lease from a third party. In deciding to sell the stations, what Gomez meant was that Rocabaja and Fat Man Oil were to sell the inventory and goodwill at the respective sites.

[9] Fat Man Oil sold its interest in the 10450 West Flagler Street station in November 1999 for $205,000.

[10] Before she abandoned the station, Gomez transferred the station's and the convenience store's inventory to Fat Man Oil.

herself.

B.

Amoco learned of Gomez's abandonment of the 7070 West Flagler Street station when truck drivers delivering gasoline to the station informed Amoco that it was unoccupied and empty. The next month, in April 1999, Amoco filed this lawsuit against Gomez. Its complaint contained two counts. Count I, brought under the CMA, sought a declaration that Gomez had "abandoned" the service station and the recovery of the proceeds of gasoline sales she should have remitted to Amoco. Count II, brought under the CML, sought the rental payments called for by the lease.

Gomez, answering the complaint,[11] denied Amoco's allegations, and interposed eight affirmative defenses.[12] She also asserted a three-count

---

[11] The answer we refer to is Gomez's amended answer.

[12] We quote the eight affirmative defenses and number them for convenience. Since they did not refer to a given count, we assume that the pleader meant them to apply to both counts of Amoco's complaint. These defenses allege that:

(1) Any and all damages incurred by [Amoco] were caused by [Amoco's] failure to properly maintain the equipment for dispensing of fuel at the station.
(2) The [CMA and CML] attached as exhibits to the Complaint were executed under duress and undue influence and in violation of the Petroleum Marketing Practices Act ("PMPA"), as amended, 15 U.S.C. § 2801-2806.
(3) Any and all damages incurred by [Amoco] were caused by [Amoco's] breach of the [CML] effective September 17, 1998, the [CMA] effective September 17, 1998, and their predecessor agreements.
(4) Any and all damages incurred by [Amoco] are offset by the damages incurred by

9

counterclaim. Count I alleged that Amoco fraudulently induced her to enter into the Trial Franchise Lease and sought compensatory and punitive damages. The fraud consisted of Amoco's failure to inform Gomez of a material fact, i.e., the environmental problem at the station site and that the station would be closed one month for the installation of the vapor recovery system. Had Amoco informed her of this, Gomez alleged, she would not have entered into the Trial Franchise Lease. Count II alleged that Amoco owed Gomez a fiduciary duty to inform her of the above material fact before she signed the Trial Franchise Lease, that it breached such duty, and that it should respond in compensatory damages. Count III alleged that Amoco breached the Trial Franchise Lease, the Franchise Agreement, the CMA and the CML by failing to maintain the gasoline pumps in working order. Count III sought the same relief as Count II.

---

Gomez as a result of [Amoco's] fraudulent conduct pre-dating the [CML] and [CMA] effective September 17, 1998, and [Amoco's] breach of the [Franchise Agreement] and the Trial Franchise [Lease], including subparts, amendments and attachments, executed by the parties in April of 1997.

(5) The [CMA] and [CML] effective September 17, 1998 were executed by Gomez in reliance on misrepresentations of material facts made by [Amoco] to wit: that [Amoco] would correct the ongoing problems relating to the equipment for dispensing of fuel at the station.

(6) [Amoco's] failure to provide and maintain the equipment for the adequate dispensing of fuel at the station frustrates the purpose of the [CMA] and [CML] effective September 17, 1998 and effectively discharges Gomez from all obligations contained therein.

(7) [Amoco's] failure to adequately provide and maintain equipment for dispensing of fuel at the station created an extreme and unreasonable difficulty and expense which was not anticipated by Gomez at the time she executed the [CMA] and [CML] effective September 17, 1998, and therefore Gomez's obligations under the agreements were discharged.

(8) [Amoco] has failed to mitigate its damages.

Amoco's reply to Gomez's counterclaim denied the material allegations and asserted fifteen affirmative defenses which we set out in the margin.[13] Before the case went to trial, Amoco moved for partial summary judgment on Counts I and II

[13] Like the affirmative defenses contained in Gomez's answer to Amoco's complaint, the affirmative defenses asserted in Amoco's reply to Gomez's counterclaim did not indicate the count to which they applied. We assume therefore that these defenses, which we quote below and number for convenience, were in response to all three counts of the counterclaim unless the defense, by its language, suggests otherwise. Amoco's affirmative defenses read as follows:

(1) The counterclaim, in whole or in part, fails to state a claim upon which relief may be granted. This includes Gomez's failure to allege any damages to which she is entitled.
(2) The counterclaim, in whole or in part, is barred by estoppel pursuant to Gomez's conduct regarding the two Amoco branded stations she operated as an independent business—one located at 7070 West Flagler St. and another at 10450 West Flagler St . . . . Gomez is additionally estopped in that her written agreements with Amoco contradict the claims made in the counterclaim.
(3) The counterclaim, in whole or in part, is barred by the statute of frauds.
(4) The counterclaim, in whole or in part, is barred due to the absence of any fiduciary duty recognized by law.
(5) The counterclaim, in whole or in part, is barred by the failure to mitigate damages by [Gomez] and any recovery should be reduced accordingly.
(6) The counterclaim, in whole or in part, is barred by [Gomez's] own material breaches of contract.
(7) The counterclaim, in whole or in part, is barred by the economic loss doctrine.
(8) The counterclaim, in whole or in part, is barred by the doctrine of unclean hands.
(9) Amoco is entitled to a setoff from any recovery made by Caroline Gomez.
(10) Any losses or damages sustained by Caroline Gomez, if any, were caused by third parties, persons, instrumentalities, agencies, or forces outside of the control of Amoco. Therefore, Amoco is not liable for any such losses or damages.
(11) The counterclaim, in whole or in part, is barred by the doctrines of waiver, and or laches.
(12) The counterclaim, in whole or in part, is barred by the statute of limitations.
(13) The demand for punitive damages set forth in the counterclaim should be stricken for failure to comply with Fla.Stat. §768.72.
(14) The demand for trial by jury set forth in the counterclaim should be stricken based upon a knowing and voluntary waiver of such right by Caroline Gomez.
(15) The counterclaim, in whole or in part, is barred by the doctrine of merger and the parole evidence rule.

of its complaint and to strike Gomez's affirmative defenses.[14]  Amoco also moved for summary judgment on Counts I and II and part of Count III of Gomez's counterclaim.

The district court denied Amoco's motion for partial summary judgment on Counts I and II of Amoco's complaint but struck four of Gomez's eight affirmative defenses: economic duress, fraud, frustration of purpose, and impossibility of performance.[15]  Amoco Oil Co. v. Gomez, 125 F. Supp. 2d 492, 500-06 (S.D. Fla. 2000).  Turning to Gomez's counterclaim, the court granted Amoco summary judgment on Counts I (fraudulent inducement regarding the Trial Franchise Lease), II (breach of fiduciary duty regarding the Trial Franchise Lease), and the part of Count III alleging that Amoco had breached the Trial Franchise Lease and the Franchise Agreement on the ground that a novation occurred when Gomez entered into the CMA and the CML.  Id. at 508-511.  The part of Count III alleging that Amoco had breached the CMA and CML by failing to maintain the fuel dispensing equipment at the 7070 West Flagler Street station would proceed to trial.  Id. at 510-11.

---

[14]  We use the words "moved to strike" although a motion to strike does not appear in Amoco's moving papers.  We use them because, at the hearing on Amoco's motion for partial summary judgment, Amoco contested the legal sufficiency of Gomez's affirmative defenses.

[15]  These defenses are set out in note 12, supra, as defenses (2), (4), (6) and ((7).

The parties agreed to conduct a bifurcated trial on the issues of liability and damages. At the conclusion of the liability phase of the trial both Gomez and Amoco moved for judgment as a matter of law.[16] Amoco sought judgment on its CMA and CML claims in Counts I and II, respectively; Gomez sought summary judgment on those counts on the basis of her PMPA defense.[17] Addressing Count I, the court ruled (and the parties agreed) that Gomez had breached the CMA by not paying Amoco its share of the gasoline-sale proceeds and that none of her affirmative defenses applied to that count. The court therefore granted Amoco judgment as a matter of law on Count I as to the issue of liability. On Count II, the court ruled that Gomez had breached the CML by abandoning the premises but that two of her affirmative defenses—that Amoco's failure to maintain the fuel pumps or that Amoco's "fraudulent" misrepresentation that it would correct the fuel-pump problem excused her actions—should go to the jury under special verdicts.[18] See Fed. R. Civ. P. 49(a).

[16] See Fed. R. Civ. P. 50(a).

[17] Gomez's PMPA defense was part of affirmative defense (2) which also contained the defenses of duress and undue influence. See supra note 12. Although the district court struck those two defenses (following the hearing on Amoco's motion for partial summary judgment), it permitted Gomez to go forward with her PMPA defense.

[18] These are the defenses set out in note 12, supra, as (1) and (3) and (5). The court combined (1) and (3) because they had the same factual basis: Amoco's failure to maintain the fuel pumps in working order. The parties and the court apparently failed to recognize that defense (5) had the same factual basis as defenses (1) and (3). Defense (5), which the court

13

Gomez's PMPA defense, as stated in her answer to Amoco's complaint, was a vague claim that Amoco had executed the CMA and CML "in violation of the [PMPA]." See supra note 12. At the hearing on Amoco's motion for partial summary judgment, Gomez explained that this defense was based on Amoco's breach of PMPA's notice requirement by canceling (with Gomez's consent) the Franchise Agreement (and replacing it with the CMA and CML). The PMPA's notice requirement is contained in 15 U.S.C. § 2804(a), which states, in part:

> Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship— (1) in the manner described in subsection (c) of this section; and (2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.

The court questioned the parties as to whether section 2804(a) provided a franchisee an affirmative defense (to claims such as Amoco was making) or an independent cause of action. Neither party had considered the issue, so the court

referred to as the fraud defense at trial, alleged that Amoco misrepresented a material fact—that it would correct the fuel-pump problem. That Amoco would correct the problem was a promise, however, not a material fact that would support a fraud claim. Under Florida law, inducing a party to enter into a contract by misrepresenting a material fact on which the party justifiably relies to its detriment constitutes an independent tort. See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So. 2d 1238, 1240 (Fla. 1996). Fraud of this type is "extraneous to the contract" and is distinguished from "fraud interwoven with the breach of contract. With regard to the latter kind of fraud, the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort." Id. Nonetheless, because neither party objected, the court instructed the jury on the elements of the tort of fraud in the inducement as an affirmative defense.

14

recessed the proceedings for the day to enable the parties to research it. The next day, after hearing from both sides, the court held that although the statute permitted franchisees to use the notice provision as a "sword," it could not be used as a "shield." In other words, according to the court, if a franchisor terminates a franchise agreement without affording the franchisee the required notice, the statute gives the franchisee the right to bring an action to void the termination; it does not, however, provide the franchisee an affirmative defense in a situation such as the one presented here. The court therefore struck Gomez's PMPA defense as legally insufficient.

After the court ruled, Gomez moved the court to designate her PMPA defense as a counterclaim pursuant to Rule 8(c) of the Federal Rules of Civil Procedure. Rule 8(c) provides, in relevant part, that "[w]hen a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Amoco, in response, urged the court to deny the motion, contending that it could not possibly prepare to defend the counterclaim while the trial was underway. After hearing from Gomez, the court denied her motion on the ground that by entering into the CMA and CML, the parties had mutually cancelled the Franchise Agreement and rendered PMPA's notice

provision inoperative.

The above rulings having been made, the case went to the jury on Gomez's two affirmative defenses to Amoco's Count II and on Count III of Gomez's counterclaim. A jury finding for Gomez on her affirmative defenses would excuse her abandonment of the station and preclude Amoco from recovering on Count II the rent due under the CML. Since Count III of Gomez's counterclaim was based on the same theory as her first affirmative defense, i.e., Amoco failed to maintain the pumps in working order, a jury finding for Gomez on that defense would require the court to hold Amoco liable on Count III—provided that the jury found against Amoco on its affirmative defense of waiver.[19]

In special verdicts, the jury found for Gomez on her first affirmative defense to Amoco's Count II.[20] Pursuant to these special verdicts, the court gave judgment

---

[19] Amoco's affirmative defense of waiver is defense (11) in note 13, supra. Defense (11) also alleges that Gomez was barred from recovery (on Count III of her counterclaim) by the doctrine of laches as well as waiver. The court did not instruct the jury on laches, and we find no mention of the doctrine in the record save in defense (11). For reasons not appearing in the record, the court, in submitting Count III to the jury at the close of the liability phase of the trial, did not instruct the jury on Amoco's defense of waiver. Instead, it waited until the conclusion of the damages phase to instruct the jury on that affirmative defense.

[20] With respect to Gomez's second defense—fraud in the inducement—the jury found that Amoco, when it entered into the CMA and CML with Gomez, had fraudulently misrepresented that it would correct the fuel-pump problem, see supra note 18, but that Gomez, having accepted benefits under the CMA and CML, was estopped from claiming fraud in the inducement. Neither the court's instruction on Gomez's second defense nor the jury's findings thereon are at issue in this appeal.

16

to Gomez on Amoco's Count II. The court also ruled that Amoco was liable to Gomez on Count III of her counterclaim subject to Amoco's waiver defense which the jury would consider, confusingly enough, in the damages phase of the trial. See supra note 19.[21] Finally, the court, with the parties' consent, stated that it would determine the amount of gasoline-sale proceeds Gomez owed to Amoco on Count I, under the CMA.

After making these rulings, the court brought the jury back to the courtroom for the second phase of the trial to determine the amount of damages Gomez should receive on Count III of her counterclaim. The jury heard the testimony of one witness, Gomez. She testified that Rocabaja gave Gemar $220,000 for the

---

[21] Amoco's waiver defense, as pled, see supra note 13, which consisted essentially of one word, "waiver," gave no indication as to the conduct that constituted a waiver of Gomez's right to sue Amoco for breaching the CMA and CML. Amoco's opening statements to the jury before the liability and damages phases of the trial began likewise shed no light on the defense; neither statement even mentioned waiver. Nor did the court's instruction to the jury at the close of the damages phase of the trial tell the jury what (according to Amoco)Gomez allegedly did to waive her right to recover damages for breach of the CMA and CML contracts. The court's instruction was nothing more than a boiler plate waiver-of-rights instruction. It was not until Amoco delivered its closing argument to the jury (prior to the court's charge to the jury) that Amoco revealed its waiver theory—that Gomez, by abandoning the service station, waived her right to sue Amoco for breach of contract. It seems to us that the special verdict the jury returned at the conclusion of the liability phase on Gomez's affirmative defense—that Amoco's failure to maintain the fuel pumps excused Gomez's abandonment of the premises—vitiated Amoco's waiver defense. In other words, if, as the jury found, Amoco's failure to maintain the fuel pumps justified Gomez's abandonment of the station, then such abandonment could not have served as a defense to Gomez's Count III breach of contract counterclaim, which was based on Amoco's failure to maintain the pumps. We say all of this in passing because Gomez did not object to the court's submission of the waiver defense to the jury.

17

inventory and goodwill at the 7070 West Flagler Street facility and that she spent

$82,569 "to run the business." After Gomez rested her case, Amoco moved the

court for judgment as a matter of law, contending that, at best, Gomez's recovery

should be limited to nominal damages. The court denied the motion.

The court instructed the jury on the issue of damages, explaining that

Gomez was seeking "her loss of investment." We replicate the relevant part of the

court's damages instruction in the margin.[22] After deliberating over

---

[22] Amoco objected to the court's damages instruction to the extent that the instruction allowed the jury to consider the investment Rocabaja made in acquiring the facility's inventory and goodwill before Gomez and Amoco entered into the CMA and CML. The court denied Amoco's objection. The court's instructions on damages follow.

> As damages pursuant to [her] claim for breach of contract, Ms. Gomez is seeking her loss of investment. Under this type of damage, even though an injured party's expectation is not fulfilled by the performance of a contract . . . she is not placed in a worse position than when . . . she entered into it.
>
> If you find that Ms. Gomez is entitled to recover the loss of investment, you should consider any expenditures made by Ms. Gomez.
>
> To establish entitlement to a loss of investment, Ms. Gomez must prove . . .
>
>> A. the investment was caused and used in furtherance of the 7070 station's business in accordance with Amoco's.
>> B. the investment was used for necessary and reasonable expenses.
>> C. the lost [sic] of investment was foreseeable at the time that the C.M. agreements were entered into.
>> D. the investment was lost.
>
> . . . .

18

Ms. Gomez is entitled to recover damages only for the loss or harm that was proximately caused by Amoco's breach of [sic] implied duties under the C.M. agreements.

As a matter of law, breach of agreements is considered to have caused a loss or harm if the breach was a substantial factor in bringing the loss or harm about.

Ms. Gomez may recover such damages as would naturally result from the breach of contract whether as an ordinary consequence of such breach or as a consequence which may, under the circumstances, be presumed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it.

I further instruct you that, as a matter of law, Ms. Gomez can recover for her breach claims only the amount she can prove . . . she invested or lost in the manner explained . . . above.

Therefore, you may not award damages . . . on the breach claims unless you find that Amoco's breach of the agreements was a substantial factor in bringing Gomez's claimed damages about.

The requirements that a particular item or element of damages be reasonably foreseeable is satisfied if it is a type of loss or harm that satisfies one of the following tests:

1. the lost [sic] or harm was within the contemplation of the parties.
2. the lost [sic] or harm would ordinarily or naturally result from a breach of the type of contract involved.
3. the loss or harm was likely to result from a breach of the particular contract at issue because of special facts or circumstances of which the defendant was or should have been aware.

There is no requirement that Amoco must have been able to foresee the precise manner in which the loss or harm occurred. It is sufficient if it was foreseeable that the breach was likely to cause the type of loss or harm that, in fact, resulted from the breach.

If a breach of contract causes no actual loss or harm, or if it causes loss or harm that can't be proven with sufficient certainty to permit recovery of damages, the

19

Amoco's waiver defense and Gomez's damages, the jury, returning special verdicts, found against Amoco on the waiver issue and awarded Gomez $205,725 in damages. The district court thereafter entered judgment for Gomez on Count III of her counterclaim (after determining and deducting from the jury award the amount Gomez owed Amoco on Count I of its complaint and awarding her prejudgment interest). Following the entry of judgment, Amoco timely renewed its motion for judgment as a matter of law and, alternatively, moved for a new trial on the issue of damages.[23] The court denied the motion.

Gomez now appeals the district court's denial of her Rule 8(c) motion to recast her PMPA defense as a counterclaim and the court's decision striking five of her affirmative defenses.[24] Amoco cross-appeals the court's denial of its

---

person who was entitled to performance still has a right to recover nominal damages.

Nominal damages are token damages that serve only as a symbol of an obligation that is owed and should be limited to a fairly small or inconsequential amount.

[23] See Fed. R. Civ. P. 50(b).

[24] Four of the affirmative defenses are identified in note 15, supra, and the accompanying text. The court struck these defenses in its order dealing with the parties' motions for summary judgment. The fifth affirmative defense is Gomez's PMPA defense, which the court struck at the conclusion of the liability phase of the trial.

renewed motion for judgment as a matter of law.[25]  We resolve the issues below.

## II.

We dispose of Gomez's appeal in but a few words.  First, the fact that the court struck her affirmative defenses is of no moment because those defenses addressed Amoco's Count II claim for rental payments under the provisions of the CML, and Gomez obtained judgment on Count II.[26]  Accordingly, Gomez was not prejudiced by the court's rulings on her defenses, and any hypothetical error is harmless.  See 28 U.S.C. § 2111 (directing appellate courts to disregard "errors or defects which do not affect the substantial rights of the parties").  Second, the court's refusal to permit Gomez to amend her counterclaim to include a count based on the PMPA is unassailable.  Although case law in this circuit does not indicate the standard we are to apply in reviewing a district court's denial of Rule 8(c) motion, we believe the rule's use of the phrase "justice so requires" calls for abuse of discretion review.  389 Orange St. Partners v. Arnold, 179 F.3d 656, 664

---

[25]  Amoco asks alternatively that we direct the district court to reduce the jury verdict on damages (pursuant to which the court entered its final judgment) by $81,569, representing the amount Gomez "invested" in the business out of her personal funds—on the ground that Gomez had not pled such damages in Count III of her counterclaim.  We are unable to locate in the record Amoco's timely objection to Gomez's testimony regarding such investment and thus conclude that Amoco failed to preserve the issue for appeal.  Given our disposition of this appeal, however, the issue is irrelevant.

[26]  The defenses are irrelevant to Amoco's Count I claim under the CMA for the proceeds of gasoline sales she should have remitted to Amoco, which Gomez agreed amounted to $11,000.

(9th Cir. 1999) (holding that "we have held that a district court's [Rule 8(c)] decisions with regard to the treatment of affirmative defenses is reviewed for an abuse of discretion"); See Baez v. Banc One Leasing Corp., 348 F.3d 972, 973 (11th Cir. 2003) (holding that "[w]e review for abuse of discretion the district court's decision to deny the motion for leave to file an amended complaint" where Rule 15(a) of the Federal Rules of Civil Procedure states that leave shall be granted freely "when justice so requires"). We would be hard pressed to hold that a district court abused its discretion in denying a motion to amend a counterclaim to include a new claim for relief—a claim that would require the presentation of additional evidence from both sides—after the liability phase of the trial had closed.

Having found no merit in Gomez's appeal, we now consider Amoco's cross-appeal—specifically the question of whether the district court should have granted Amoco judgment as a matter of law on Gomez's Count III.

## III.

Amoco's motion was directed to the evidence Gomez presented to the jury in support of her claim for damages on Count III. Much of Gomez's evidence related to expenditures that were not made in her performance of her contracts with Amoco, i.e., the CMA and CML. For example, $220,000 of the funds she

said were spent in the performance of the contract were spent by Rocabaja in purchasing Gemar's inventory and goodwill at the 7070 West Flagler Street site before Gomez entered into the CMA and CML. Amoco objected to this testimony, and the court should have sustained its objection. We note that Gomez cites no authority that would have permitted her to recover individually the funds Rocabaja had invested in the site, and we find none.[27] Indeed, Florida law,[28] the governing law in this case, does not permit an individual in Gomez's situation to bring an action for damages on behalf of a corporate entity. See Lincoln Oldsmobile, Inc. v. Branch, 574 So. 2d 1111, 1114 (Fla. 2d Dist. Ct. App. 1990) ("The injury here is to the corporation and not to [the principal stockholder]. In such cases, a stockholder cannot maintain an action in his own name but must bring it in the name of the corporation. This is true even where the individual is the sole stockholder of the corporation.").

The jury award was deficient in several additional respects as well. Under Florida law, a party standing in Gomez's shoes suing for breach of contract has

---

[27] Nowhere in Count III of Gomez's counterclaim or elsewhere in the record do we find that Gomez was claiming damages (as a result of Amoco's breach of the CMA and/or CML) for the use and benefit of Rocabaja. Nor do we find any evidence—say in the form of a promissory note—that Gomez borrowed the funds the corporation invested in the station's operation and, therefore, would be entitled to claim such investment individually as her damages.

[28] The parties agree that Florida law provides the rule of decision in this case.

23

two alternatives for calculating its damages.  The party may seek lost profits, in which case the interest it is protecting is its "expectation interest," Beefy Trail, Inc. v. Beefy King Int'l, Inc., 267 So. 2d 853, 856 (Fla. 4th Dist. Ct. App. 1972), or it "may omit an attempt to show lost profits and prove instead [its] actual expenditures made before the [defendant's breach] insofar as those expenditures were reasonably . . . foreseen, i.e., expenditures made in preparation for performance or in part performance and in such case the interest the [party] seeks to protect is [its] 'reliance interest.'" Id.  Professor Corbin, who is cited by the Beefy Trail panel for authority, id., expresses these alternatives this way:

> It is often very difficult to estimate the amount of profits that have been prevented by the breach of contract not only because of uncertainty in the happening of various contingencies, but also because of difficulty in determining the money value of a promised performance or the cost of completion by the plaintiff.  There is usually little difficulty, however, in proving what has already been expended by the plaintiff prior to the date of breach by way of preparation and part-performance.  The fact that profits are too uncertain for recovery does not prevent a judgment in favor of the plaintiff for the amount of his expenditures.

11 Arthur Linton Corbin, Corbin on Contracts § 1031 (Interim ed. 2002).  Under this rule, therefore, Gomez, having elected not to seek lost profits, was entitled to recover as reliance damages the expenditures she incurred pursuant to entering

into the CMA and CML in September 1998. She testified that she spent $82,569[29] "to run the business," implying that she expended such sum in or after September 1998. A close examination of her testimony reveals, however, that $45,000 of that amount was spent in May 1997, while she was operating the service station under the Trial Franchise Lease. The district court should have sustained Amoco's objection to this testimony on two grounds: first, the expenditures could not have constituted reliance damages—because they were not incurred in the performance of the CMA and/or CML; second, the court had granted Amoco summary judgment on the part of Count III of Gomez's counterclaim that sought damages for breach of the Trial Franchise Lease. Gomez, 125 F. Supp. 2d at 510-11.

Further, Gomez's testimony reveals that part of the $82,569 spent "running the business" was spent by her corporation Fat Man Oil, not Gomez.[30] Just as Gomez lacked standing to claim for Rocabaja the $220,000 it invested in the inventory and goodwill at the 7070 West Flagler Street site, see Lincoln Oldsmobile, 574 So. 2d at 1114, she lacked standing to claim for Fat Man Oil the

---

[29] Gomez testified that the grand total of her investment in the 7070 West Flagler Street station, including the $220,000 Rocabaja spent purchasing the station's goodwill and inventory, was $302,569. Ignoring rounding errors for the purpose of our computation, we deduct from this total $220,000 to arrive at the $82,569 figure cited in the text.

[30] Gomez testified that Fat Man Oil made two expenditures: one for $22,522 (in several increments) in September 1998, the other for $7,750 in December 1998.

$30,272 it spent.[31]

In sum, all that the jury could have awarded Gomez under the reliance damages theory was $7,297. Accordingly, the court should have granted Amoco's judgment as a matter of law to the extent of $198,428, and we therefore reduce the jury's award by that amount. This means that the court should have awarded Gomez $7,297 plus prejudgment interest on that amount (which Amoco does not challenge) less the $11,000 Gomez owes Amoco on Count I of Amoco's complaint. On receipt of our mandate, the court shall make the appropriate calculations and enter judgment accordingly.

The judgment of the district court is VACATED and the case is REMANDED with instructions.

SO ORDERED.

---

[31] Nowhere in Count III of Gomez's counterclaim or elsewhere in the record do we find that Gomez was claiming damages (as a result of Amoco's breach of the CMA and/or CML) for the use and benefit of Fat Man Oil. Nor do we find any evidence—say in the form of a promissory note—that Gomez borrowed the funds the corporation invested in the station's operation and, therefore, would be entitled to claim such investment individually as her damages.