2005 UT App 536

The BERKSHIRES, L.L.C., a Utah limited liability company; Pepjaans I, a general partnership; Peaco, Ltd., a limited liability partnership; and Patrick W. Ashton, Plaintiffs and Appellees,

v.

Dwane J. SYKES; Frontier International Land Corporation, an Alaska corporation; and Sykes Trust, Defendants and Appellants.

No. 20040503–CA.

Court of Appeals of Utah.

Dec. 15, 2005.

Justin D. Heideman, Ascione Heideman & McKay LLC, Provo, for Appellants.

Bruce A. Maak and Michael Black, Parr Waddoups Brown Gee & Loveless, Salt Lake City, for Appellees.

Before Judges DAVIS, GREENWOOD, and THORNE.

## OPINION

DAVIS, Judge:

¶ 1 Dwane J. Sykes, Frontier International Land Corporation, and the Sykes Trust (collectively Defendants) appeal the district court's final judgment against them. We affirm.

## BACKGROUND

¶ 2 We take the following background information from the district court's detailed findings of fact. *See Roderick v. Ricks*, 2002 UT 84, ¶ 2, 54 P.3d 1119. The Berkshires L.C. (Berkshires) contracted to purchase two parcels of land in Orem, Utah, one owned by David and Helen Carter (the Carter Parcel) and the other owned by Patrick W. Ashton and others [1] (the Ashton Parcel). Berkshires intended to use the land in a residential subdivision project, for which it had been seeking approval from the City of Orem.

¶ 3 During the process of obtaining the approval, Berkshires was met with active opposition from Dwane Sykes, who was an officer and controlling manager of Frontier International Land Corporation (Frontier). Sykes also held himself out to be a representative of the Dwane Sykes family trust (Sykes Trust),[2] which owned land near the proposed development site.

¶ 4 On November 30, 1999, just hours before Berkshires was to close its purchase of the Carter Parcel, Sykes recorded with the Utah County recorder a "Grant of Right of Way Easements" document dated June 1, 1977, (Easement Document) and a "Quit Claim Deed" document dated October 9, 1976, (Quit Claim Deed).[3] Both documents purported to bear the signatures of several grantors, each of whom was deceased at the time of recording, and were apparently notarized by the signature of Sharon Peterson. The Easement Document purported to create burdensome easements across both the Carter Parcel and the Ashton Parcel, which essentially rendered large portions of both properties unusable for Berkshires's proposed subdivision. The purported right-of-way would run through the center of the Carter house on the Carter Parcel, and in the case of the Ashton Parcel, a sixty-six foot wide right-of-way would occupy several acres. Sykes claimed he obtained the Easement Document from the grantors for ten dollars consideration.

¶ 5 In an effort to impede Orem City's approval of Berkshires's subdivision plan, Sykes brought the Easement Document to the attention of the city, which at that time was in the final stages of granting approval. In light of the Easement Document, the city

---

1. The other owners were Pepjaans I, which is a general partnership, and Peaco, Ltd.

2. The Sykes Trust was created by Sykes, who continued to control substantially all of its affairs, while E.L. Roy Duce, the named trustee, had no significant involvement.

3. The Quit Claim Deed did not affect the Berkshires development.

withheld approval for the affected portions, and Berkshires was forced to reconfigure its plan and seek approval for the unaffected portions. Sykes then approached Berkshires and offered to make the Easement Document "go away" if Berkshires conveyed to him or his entities five lots with a combined value of over $1 million.

¶ 6 In June 2000, Berkshires and the owners of the Ashton Parcel (collectively Plaintiffs) brought suit against Defendants and others for slander of title and interference with economic relations, claiming that Sykes and his entities had intentionally fabricated the Easement Document. As the litigation progressed, the district court ordered April 7, 2001, to be the discovery cutoff date and May 7, 2001, to be the dispositive motion cutoff date. After the cutoff dates, the parties filed three motions that are relevant to the present appeal, which the court addressed initially in its July 31, 2002 ruling and in more detail in its September 20, 2002 Order on Motions. In its ruling, the court observed that all three motions were filed after the cutoff dates but concluded that because both sides had filed motions after the cutoff dates, the parties had "tacitly agreed" to ignore the cutoff dates.

¶ 7 The first of these motions was a motion for partial summary judgment filed by Plaintiffs on September 19, 2001, claiming inter alia that the Easement Document was invalid due to inadequate consideration. The district court granted the motion, determining that the evidence had shown that no consideration was in fact given for the Easement Document.

¶ 8 The second was a motion to amend pleadings (Motion to Amend), which was filed by Defendants. The trial court denied the motion, concluding in the July 31, 2002 ruling that "[a]t this late date, when discovery is complete and dispositive motions have passed, it is too late to amend the pleadings to assert new claims." In the September 20, 2002 Order on Motions, the court went on to explain that the motion was denied because "(i) it was made after the close of discovery and after the date for dispositive motions, (ii) no grounds have been advanced why the motion could not have been made at an earli-

er time, and (iii) plaintiff would be prejudiced were the motion granted."

¶ 9 The third was a motion entitled "Defendants' Cross-motion for Partial Summary Judgment, Part 1 of 4: Public Roadway" (Summary Judgment Motion) filed by Defendants on October 26, 2001. The motion asserted that Hope Lane, a road running along the southern border of the Carter Parcel and traversing the Ashton Parcel, was a public road and, thereby, accessible by Defendants regardless of the Easement Document. The motion claimed it to be an undisputed fact that "Hope Lane has been in continuous use as a public thoroughfare for more than ten years" and included affidavits by Sykes and others purporting to confirm the fact. In its ruling, the court struck the affidavits supporting the motion on grounds that the affiants had not been identified until long after the discovery cutoff date. It also struck an affidavit given by Sykes, determining that it was merely conclusory and lacked foundation. The court then denied the motion for two reasons. It determined first that none of the Defendants had raised the issue as a counterclaim because their original answer merely stated that "[a]s a separate and affirmative defense, Defendants ... allege that Hope Lane is a public road," without making any further affirmative claim for relief. It also determined that, even had the issue been properly raised, Defendants had not provided any admissible evidence supporting the motion.

¶ 10 The suit went to trial, and the district court heard evidence from a variety of witnesses, including handwriting testimony from an expert witness and relatives of the purported grantors suggesting that the signatures on the Easement Document were not authentic. The district court entered its Findings of Fact and Conclusions of Law on April 28, 2004, ruling that Sykes had forged the signatures. This determination rested on the following findings:

(a) All six signatures on the Easement Document and the two signatures on the Quit Claim Deed were signed using the same pen.

(b) Both the Quit Claim Deed and the Easement Document were typed on the same typewriter at the same time.

(c) George Throckmorton, an eminent handwriting expert, testified that all six signatures are in all likelihood simulated forgeries.

(d) P.E. Ashton[, purported grantor and signatory of the Easement Document,] did not like Dwane Sykes, and it makes no sense that he would grant a burdensome easement to Sykes or his entities over several acres of his property for just ten dollars, as claimed by Dwane Sykes.

(e) P.E. and Eleanor L. Ashton[, both purported grantors and signatories of the Easement Document,] always consulted with their son, John Ashton, regarding legal matters, but they never consulted with him about the Easement Document. The signatures of P.E. Ashton and Eleanor Ashton did not appear genuine to John Ashton, their son, who was familiar with their signatures.

(f) Ralph Carter[, purported grantor and signatory of the Easement Document,] did not like Dwane Sykes. It makes no sense that Ralph Carter would, for almost no consideration, give Dwane Sykes a right-of-way, particularly one that went through the middle of his house and barn. Years after the right-of-way was purportedly given, Dwane Sykes asked Ralph Carter for an easement over the same area. Years after the Easement Document was purportedly executed, Dwane Sykes attempted to pass over the easement area, but Ralph Carter blocked his access and would not allow him access.

(g) Dwane Sykes, who is sophisticated in the real estate area, did not, according to his testimony, record the Easement Document for approximately 22 years after it was purportedly executed, and when he did so, he did it just hours before the Berkshires's closing on the purchase of the Carter Parcel. His explanation for the delay was contradictory and not credible.

(h) On the date that the Easement Document was purportedly executed, both Dwane and [his ex-wife,] Patricia Sykes[,] owned the [adjoining parcels], which were parcels benefitted by the Easement Document. As a person sophisticated in real estate, Dwane Sykes knew that Patricia Sykes, as an owner of the parcels purportedly benefitted by the Easement Document, should have been included as grantee, but she was not included.

(i) Hugh Vern Wentz[, purported grantor and signatory of the Easement Document,] was a Judge and lawyer who would know that, after he gave the Quit Claim Deed, he was not a necessary signatory to the Easement Document, which granted easements only over land included within the Quit Claim Deed. At the time of the purported execution of the Easement Document, Hugh Vern Wentz had suffered serious health problems, couldn't drive a car, and was mentally and physically impaired. It is not credible that he drafted and executed the Easement Document and Quit Claim Deed and circulated them for signature, as Dwane Sykes claims.

(j) Dwane Sykes, who actively opposed Berkshires's subdivision approval for a long period of time, did not mention the existence of the Easement Document for months. In October[ ] 1999, he asked Orem City to condition Berkshires's subdivision approval on Berkshires's giving rights-of-way to the Sykes's parcels, which is inconsistent with the pre-existence of the Easement Document, which granted rights-of-way over the same areas.

(k) In meetings with Berkshires representatives just a few weeks before November 30, 1999, Dwane Sykes did not mention any written or express easement, but instead claimed that the Sykes family owned a prescriptive easement over the areas over which an express easement was granted by the Easement Document.

(l) Dwane Sykes told Berkshires after November 30, 1999[,] that he had seen the signatories execute the Easement Document, while at trial he testified that he had not.

(m) No one other than Dwane Sykes saw the Easement Document or Quit Claim Deed in the approximately 22 years between their execution and their recordation. Diane George, who is or was the

1248

spouse of Dwane Sykes, was not credible when she testified that she saw the Easement Document prior to November[ ] 1999. The Court finds that she did not even attend that meeting at which she claimed to have seen the Easement Document and she claimed at the meeting to have seen a survey that did not yet exist at the time of the meeting.

(n) Dennis Sykes, a shareholder and officer of Frontier who, along with Dennis Sykes himself, were named grantees under the Easement Document and Quit Claim Deed, never saw either document and was completely unaware of their existence until after this action was filed.

(o) Patricia Sykes, Dwane Sykes's former wife, who was secretary of Frontier and intimately involved in all real property dealings of the Sykes family and their entities, never saw or heard about the Easement Document or the Quit Claim Deed prior to the filing of this action. Her relationship to the Sykes family's real property dealings was such that she would have known of the existence of the Easement Document and Quit Claim Deed had they existed at the time they were purportedly executed and thereafter. Patricia Sykes saw blank notarizations executed by Sharon Peterson, the purported Notary of the Easement Document, in Dwane Sykes's home office in the late 1970s.

(p) Mark Sykes, the son of Dwane Sykes, was completely unaware of any dealings with the Carters or Ashtons regarding a right-of-way and did not see and was not aware of the Easement Document or Quit Claim Deed until after this action was filed.

(q) The purported Notary on the Easement Document and Quit Claim Deed, Sharon Peterson, testified that she could not state with certainty that she executed as notary the Easement Document and Quit Claim Deed, that she had no memory of notarizing those documents, and that she had no memory of the signatories executing them before her.

Based on these findings, the court concluded that Sykes, along with his related entities, Frontier and the Sykes Trust, were liable to Plaintiffs for slander of title and interference with economic relations. Defendants appeal.

ISSUES AND STANDARDS OF REVIEW

¶ 11 On appeal Defendants contest several aspects of the proceedings below. First, Defendants challenge the district court's denial of their Motion to Amend, which we will reverse only if Defendants " 'establish[ ] an abuse of discretion resulting in prejudice.' " *Pride Stables v. Homestead Golf Club, Inc.,* 2003 UT App 411, ¶ 11, 82 P.3d 198 (quoting *Nunez v. Albo,* 2002 UT App 247, ¶ 10, 53 P.3d 2) (other quotations and citation omitted), *cert. denied,* 90 P.3d 1041 (Utah 2004).

¶ 12 Second, Defendants challenge the district court's denial of their Summary Judgment Motion claiming the court failed to treat their affirmative defense as a counterclaim under rule 8(c) of the Utah Rules of Civil Procedure. Because Utah courts have not addressed the applicable standard of review for such issues, we turn to federal decisions interpreting the identical federal rule. *See State v. Rothlisberger,* 2004 UT App 226, ¶ 14, 95 P.3d 1193 ("In circumstances in which Utah courts have not definitively addressed an issue, it is appropriate for us to turn to decisions and commentators that interpret related federal rules for guidance."), *cert. granted,* 106 P.3d 743 (Utah 2004). Accordingly, we agree with federal courts that an abuse of discretion standard should apply. *See Amoco Oil Co. v. Gomez,* 379 F.3d 1266, 1276 (11th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1693, 161 L.Ed.2d 539 (2005); *389 Orange St. Partners v. Arnold,* 179 F.3d 656, 664 (9th Cir.1999). Such an approach has been hinted at in our case law. *See Cheney v. Rucker,* 14 Utah 2d 205, 381 P.2d 86, 91 (1963) (reviewing rules related to rule 8(c) for abuse of discretion). We review other aspects of the Summary Judgment Motion for correctness. *See Pride Stables,* 2003 UT App 411 at ¶ 12, 82 P.3d 198.

¶ 13 Third, Defendants claim the district court erred in admitting the testimony of a handwriting expert, non-expert witnesses, and other evidence of forgery when a notary public was a "subscribing witness" to the documents under Utah Code section § 57-2-10 and –14. *See* Utah Code Ann. § 57-2-

10, –14 (2000). Because this issue relies on the interpretation of a statute, we review the district court's admission of evidence for correctness. *See Cazares v. Cosby*, 2003 UT 3, ¶ 11, 65 P.3d 1184.

¶ 14 Finally, Defendants claim the district court erred in determining the claimed easements are invalid for lack of consideration. Because the court addressed this issue on summary judgment, we review it for correctness. *See Pride Stables*, 2003 UT App 411 at ¶ 12, 82 P.3d 198.

## ANALYSIS

### I. Motion to Amend

■ ¶ 15 Defendants first argue that the district court improperly denied their Motion to Amend as untimely, claiming that the court retroactively applied a previously unknown deadline. Although Defendants contend that the district court refused to consider the motion on its merits, this is not reflected in the record. As already noted, the district court denied the motion because "(i) it was made after the close of discovery and after the date for dispositive motions, (ii) no grounds have been advanced why the motion could not have been made at an earlier time, and (iii) plaintiff would be prejudiced were the motion granted." We agree with the district court's assessment and conclude it did not abuse its discretion in so ruling. While leave to amend " 'shall be freely given when justice so requires,' . . . the dimensions of liberality are generally defined by the trial judge, who is best positioned to evaluate the motion to amend in the context of the scope and duration of the lawsuit." *Smith v. Grand Canyon Expeditions Co.*, 2003 UT 57, ¶ 32, 84 P.3d 1154 (quoting Utah R. Civ. P. 15(a)). Specifically, "Utah courts should consider the following factors in determining whether to allow amendment: (1) the timeliness of the motion; (2) the justification for delay; and (3) any resulting prejudice to the responding party." *Atcitty v. Board of Educ.*, 967 P.2d 1261, 1264 (Utah Ct.App. 1998). Here, the court ruled that Defendants' motion was untimely: without offering a justification for the delay, Defendants filed the motion over six months after the dispositive motion cutoff date, over seven months

after the discovery cutoff, and over eleven months after they filed their answer. Moreover, requiring Plaintiffs to address an amended pleading on the eve of trial after over a year of litigation, including discovery and motion phases, would undoubtedly result in prejudice to them. Given these circumstances, we cannot conclude the district court abused its discretion in denying the motion.

### II. Summary Judgment Motion

■ ¶ 16 Defendants next contend that the district court improperly denied their Summary Judgment Motion because it refused to consider the motion on its merits. While the court did deny the motion on procedural grounds, determining that Defendants had not properly pleaded the issue of Hope Road as a counterclaim, it also determined that even had Defendants properly raised the issue, they had not presented any admissible evidence to support their assertion. We agree with the district court.

■ ¶ 17 With regard to the sufficiency of Defendants' pleading on the issue of Hope Lane, we have already noted that the pleading in its entirety consisted of a single sentence: "As a separate and affirmative defense, Defendants . . . allege that Hope Lane is a public road." On appeal, Defendants contend that the district court should have determined this statement was sufficient to assert a counterclaim and not just an affirmative defense. They rely on rule 8 of the Utah Rules of Civil Procedure, which provides that "[w]hen a party has mistakenly designated . . . a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleadings as if there had been a proper designation." Utah R. Civ. P. 8(c). However, the district court's decision to redesignate an affirmative defense as a counterclaim is discretionary, *see* 2 James Wm. Moore et al., *Moore's Federal Practice* § 8.07[7] (3d ed. 2005) ("A court is not required to redesignate in all circumstances, however. The determination of whether to redesignate a defense . . . in this way is within the district court's discretion."), and as noted, we review the court's ruling only for an abuse of that discretion, *see, e.g., Amoco*

*Oil Co. v. Gomez,* 379 F.3d 1266, 1276 (11th Cir.2004), *cert. denied,* 544 U.S. 956, 125 S.Ct. 1693, 161 L.Ed.2d 539 (2005).

¶ 18 Many factors may be relevant in the court's decision to treat an affirmative defense as a counterclaim. For instance, the court may consider whether the defense-turned-counterclaim would foist an unanticipated issue on the other party or whether the affirmative defense as articulated in the pleadings would have provided the other party with sufficient notice and opportunity to address the issue. *See Pett v. Autoliv ASP, Inc.,* 2005 UT 2, ¶ 7, 106 P.3d 705. The court may also consider whether the defense as argued or articulated in the pleadings sufficiently states a claim for relief and a demand for judgment as required by rule 8(a) of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 8(a). Factors pertinent to a motion to amend may also be useful, namely, whether the motion was timely (as opposed to filed late in the proceedings), justifiable, and without undue prejudice to the opposing party. *See Atcitty,* 967 P.2d at 1264.

¶ 19 At the heart of the matter here is whether Plaintiffs should have recognized that Defendants' statement "Hope Lane is a public road" was in reality a counterclaim, though labeled an affirmative defense. Here, the statement on its face is not readily identifiable as a counterclaim; it requests no relief and does not demand judgment. Further, it is not certain that Plaintiffs should have been on notice that the statement should be treated as a counterclaim, especially when Defendants first sought to raise it as a counterclaim late in the proceedings, long after the cutoff for discovery and dispositive motions, and supported it with surprise evidence and witnesses not mentioned in discovery. With the shifting nature of this issue and the danger of unfair prejudice to Plaintiffs, we cannot conclude the district court abused its discretion in refusing to treat it as a viable counterclaim. Since Defendants did not properly plead a counterclaim and did not provide evidence to support their assertion, the district court was correct in denying the Summary Judgment Motion.

### III. The Subscribing Witness Statute

█ ¶ 20 Defendants also contend that the district court erred by admitting lay and expert handwriting evidence, which they claim is inadmissible to challenge a conveyance document certified by a notary public acting as a "subscribing witness" under Utah Code sections 57–2–10 and –14. *See* Utah Code Ann. §§ 57–2–10, –14 (2000). Both sections are part of the Utah acknowledgments statute. *See id.* §§ 57–2–10 to –17 (2000). Section 57–2–10 provides that

> [t]he proof of the execution of any conveyance whereby real estate is conveyed or may be affected shall be:
> (1) by the testimony of a subscribing witness, if there is one; or
> (2) when all the subscribing witnesses are dead, or cannot be had, by evidence of the handwriting of the party, and of a subscribing witness, if there is one, given by credible witnesses to each signature.

*Id.* § 57–2–10. Section 57–2–14 then provides that

> [n]o proof by evidence of the handwriting of a party, or of the subscribing witness or witnesses, shall be taken unless the officer taking the same shall be satisfied that all the subscribing witnesses to such conveyance are dead, out of the jurisdiction, or cannot be had to prove the execution thereof.

*Id.* § 57–2–14. Defendants claim that Peterson, the purported notary acknowledging the Easement Document, was a "subscribing witness" and that the district court should have relied on her testimony to the exclusion of other expert and non-expert witnesses testifying regarding the validity of the document. Defendants did not object to the admission of the evidence at trial, but raise it on appeal claiming the trial court committed plain error. Although they address the applicability of sections 57–2–10 and –14 in their opening brief on appeal, they raised the plain error argument only in their reply brief. We decline to review the issue of plain error when raised for the first time in an appellant's reply brief. *See State v. Weaver,* 2005 UT 49, ¶ 19, 122 P.3d 566; *Coleman v. Stevens,* 2000 UT 98, ¶ 9, 17 P.3d 1122.

█ ¶ 21 Even if the issue were properly raised, we would conclude that the trial court did not commit plain error. "To demonstrate

plain error, a defendant must establish that '(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant.'" *State v. Dean*, 2004 UT 63, ¶ 15, 95 P.3d 276 (quoting *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346). Here, we would not conclude that the error was obvious because the statutory provisions are not entirely clear. The statute does not define "subscribing witness," and although the Utah Supreme Court in *Cazares v. Cosby* held that a notary who personally witnesses the execution of a deed may be a subscribing witness, *see* 2003 UT 3, ¶ 20, 65 P.3d 1184, Defendants concede in their opening brief that "[t]he instant case presents a particularly unique question that is not entirely answered by recourse to the *Cazares* case." Here, where Defendants assert that the notary public should be considered a subscribing witness even though, as the trial court found, she could not state with certainty that she personally witnessed the execution of the deed, we agree that *Cazares* offers little help and itself raises several questions. This, combined with the fact that *Cazares* is the only Utah case to address the provisions in question since 1887, *see Tarpey v. Desert Salt Co.*, 5 Utah 205, 14 P. 338 (1887), we would conclude that the proper application of these sections was not obvious to the district court.[4]

## IV. Lack of Consideration

¶ 22 Defendants make one final point on appeal, which is that the district court also applied the acknowledgments statute to the evidence heard at trial. The hierarchy of evidence is useful in an acknowledgment proceeding, where the notary or other official serves the narrow function of determining whether the signatures on a conveyance are authentic and does not make factual findings. *See id.* § 57-2-13 (2000). For such purposes, it makes sense that a notary should rely first on any available subscribing witnesses before turning to handwriting evidence. In contrast, imposing such a hierarchy at trial would only impede the trial court's ability to assess all relevant evidence, including the credibility of the notary and her certificate. Indeed, applying the evidentiary limits of the acknowledgments statute to forgery trials would likely facilitate forgery in cases where the forger is assisted by a notary acting either negligently or as a willful accomplice.

Finally, although the Utah Supreme Court in *Cazares* suggests sections 57-2-10 and -14 apply to district court proceedings, *see* 2003 UT 3 at ¶ 16, 65 P.3d 1184 (reviewing trial court's exclusion of handwriting evidence based on sections 57-2-10 and -14), it should not be read to alter the otherwise clear scope of those sections. *Cazares* considered only when a notary may be regarded a "subscribing witness" and did not explicitly hold that the scope of these sections encompasses trial proceedings. *See id.* at ¶¶ 16–24.

In sum, we fail to understand why Defendants assert that sections 57-2-10 and -14 of the acknowledgments statute would limit the evidence heard at a bench trial. Our understanding is that these sections were enacted as part of the acknowledgments statute, serve a precise purpose within that statutory scheme, and by virtue this context, should apply only to the proof taken as part of an acknowledgment proceeding.

---

4. Furthermore, Defendants' assumption that sections 57-2-10 and -14 of the acknowledgments statute apply to limit the evidence taken at a bench trial is not beyond dispute. When these sections are properly understood, it appears that Defendants misconstrue the purpose and scope of these sections, possibly resulting from their interpretation of *Cazares v. Cosby*, 2003 UT 3, 65 P.3d 1184. Defendants read these sections in isolation and claim they apply beyond the acknowledgments context to all proceedings in which proof of a land conveyance is at issue, including the forgery trial in this case. While section 57-2-10 by its own terms seems to apply broadly to any "proof of the execution of any conveyance whereby real estate is conveyed or may be affected," Utah Code Ann. § 57-2-10 (2000), we read this provision in the context of the entire statutory scheme, *see Green River Canal Co. v. Olds*, 2004 UT 106, ¶ 18, 110 P.3d 666. In doing so here, it is apparent that the scope of sections 57-2-10 and -14 is very limited and would not exclude the evidence offered in this case.

First, basic statutory construction suggests that because sections 57-2-10 and -14 are taken from the Utah acknowledgments statute, *see* Utah Code Ann. §§ 57-2-10 to -17 (2000), they affect only the evidence taken under that statute, namely, the proof taken by a notary or other authorized official in determining whether the signatures on a conveyance are authentic for the purpose of issuing a certificate to that effect. There is no indication in the statute that these sections are to apply to other forms of evidentiary hearings. This conclusion is confirmed when these sections are read in light of the original statutory scheme, prior to the repeal of certain sections in 1988. *See id.* §§ 57-2-1 to -9 (1986) (repealed 1988).

Second, from a practical standpoint, it makes little sense to apply the evidentiary hierarchy of

committed plain error in determining that the Easement Document was invalid due to lack of consideration. Having determined that the district court correctly concluded that both documents were forgeries, we need not reach this question.

## CONCLUSION

¶ 23 Having found no grounds upon which to reverse the district court's judgment against Defendants, we affirm.

¶ 24 WE CONCUR: PAMELA T. GREENWOOD, Judge and WILLIAM A. THORNE JR., Judge.