**In re MAXXIM MEDICAL GROUP, INC., et al., Debtors.**

**Maxxim Medical, Inc., Medline Industries, Inc., Plaintiffs,**

v.

**Professional Hospital Supply, Inc. and Karen McCauley, Defendants.**

**Bankruptcy No. 03–10438 (PJW).**
**Adversary No. 8–03–mp–00026–MGW.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 31, 2010.

Peter James Duhig, Klett Rooney Lieber & Schorling, Wilmington, DE, Jordi Guso, Paul S. Singerman, Berger Singerman P.A., Miami, FL, Henry H. Janssen, Daniel P. Ring, James A. Willhite, Jr., Janssen Law Offices, Philadelphia, PA, Edward J. Kosmowski, Matthew B. Lunn, Young Conaway Stargatt & Taylor, Wilmington, DE, for Plaintiffs.

Christopher Martin Winter, Michael R. Lastowski, Duane Morris LLP, Wilimington, DE, Dennis J. LeVine, Tampa, FL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

In this adversary proceeding, the Plaintiff, Maxxim Medical, Inc.,[1] alleges that Defendant, Karen McCauley, a sales representative of Maxxim, violated a covenant not to compete contained in her sales representative agreement with Maxxim when she went to work for a competitor, Defendant Professional Hospital Supply, Inc. ("PHS"). Maxxim further alleges that not only did both McCauley and PHS lure away Maxxim's customers when McCauley went to work for PHS, but in the process also misappropriated trade secrets primarily in the form of the design and contents of custom procedure trays ("CPTs") that were McCauley's primary product within her sales area.

In summary, after considering carefully the evidence produced at trial,[2] the Court finds that while McCauley knowingly violated her covenant not to compete in going to work for PHS, at the end of the day, Maxxim suffered no damages as a result of McCauley's actions. That is, the loss of the Maine business by Maxxim was due to the poor quality of Maxxim's services and goods, the loss of a key group purchasing contract, and the filing of its Chapter 11. Neither PHS nor McCauley were in any way responsible for these factors. It was Maxxim's own failures rather than any action by PHS or McCauley that resulted in the loss of the CPT business in Maine

by Maxxim. Accordingly, for the reasons set forth below, judgment will be entered in favor of the Defendants.

## FINDINGS OF FACT

1. The Parties

a. Maxxim

When Maxxim commenced this adversary proceeding on October 17, 2003, it was a debtor in possession in a Chapter 11 case pending in the United States Bankruptcy Court for the District of Delaware. Maxxim was a medical services and supply company. Its business included the assembly and sale of CPTs used for surgeries and other medical procedures.

b. Karen McCauley

Maxxim employed Karen McCauley as a sales representative from July 1, 2002 until June 27, 2003. Her geographical area was the entire state of Maine, and two pre-existing Maxxim accounts in New Hampshire.[3] The product lines assigned to McCauley included all of Maxxim's vascular, surgical, and medical products, including CPTs.[4]

c. PHS

At the time Maxxim commenced this adversary proceeding, PHS was a California corporation with its principal place of business in Temecula, California. Like Maxxim, PHS was also engaged in the CPT business but had only recently expanded into the New England region. When McCauley left her employment with

---

1. The other Plaintiff in this adversary proceeding is Medline Industries, Inc. ("Medline"), which has an interest in this proceeding by virtue of its purchase of Maxxim's assets in Maxxim's Chapter 11 case. References to "Maxxim" or "Plaintiff" are intended to include Medline unless otherwise indicated by the context.

2. The trial lasted twenty-six days and was conducted over a period of six months.

3. Trial Tr. 1:20–21.

4. *Id.* at 1:19–29; 3:40.

Maxxim on June 27, 2003, she became an employee of PHS working in the same product line and geographical area in which she had worked for Maxxim.

#### d. Medline

Subsequent to the commencement of this adversary proceeding, on October 28, 2003, Medline Industries, Inc. ("Medline") purchased all of the assets of Maxxim in a sale authorized pursuant to 11 U.S.C. § 363 by the bankruptcy court in which Maxxim's Chapter 11 case was pending. Subsequently, Medline intervened as a party plaintiff in this adversary proceeding. Based on an agreement between Maxxim and Medline, Medline would be entitled to damages or settlement proceeds relating to the Defendants' conduct on or after November 10, 2003, and Maxxim would be entitled to damages or settlement proceeds relating to the Defendants' conduct prior to November 10, 2003.[5]

### 2. McCauley's Contract and Employment by Maxxim

Prior to working for Maxxim, McCauley had twelve years' experience in the health care industry.[6] McCauley's level of experience appealed to Maxxim.[7] In this respect, she was considered by Maxxim as a "turn-key employee."[8] That is, one who could be handed an existing client base knowing that the clients would be serviced because of her general skills and knowledge.[9] As a result, McCauley was able to "step right in."[10] Importantly, at the time she started her employment at Maxxim, she already knew the decision makers at some of the major medical facilities and important customers in her territory: Maine Medical Center ("Maine Medical"), Maine General Medical Center ("Maine General"), Penobscot Bay Medical Center ("Penobscot Bay"), and St. Joseph's Hospital ("St. Joseph's").[11]

Tom Pilkington was McCauley's direct supervisor at Maxxim. He was involved with hiring McCauley. During the discussions leading up to McCauley's employment, Pilkington sent McCauley a standard form of sales representative agreement ("SRA"). McCauley received this in an email of June 24, 2002.[12] In the email, Pilkington wrote: "Karen, Please see attachment requiring your signature. Return it to: Shira Blumenstein, Maxxim Medical [street address in original].... If you have any questions, please advise. Thanks, TP ([cell phone number in original])."[13]

The SRA contains a covenant not to compete.[14] It prohibits McCauley, while she was a Maxxim sales representative and for one year thereafter, from rendering services to any competitor within her assigned territory, from entering into any service agreement, from being employed by, or from acting as agent or independent contractor for a competing business.[15] This provision concerned McCauley because Maxxim's business in her geographical area depended in substantial part on

---

5. Stipulation and Order of May 12, 2004 (Doc. No. 14).

6. Trial Tr. 20:7–8.

7. *Id.* at 3:27.

8. *Id.* at 14:208.

9. *Id.* at 14:208.

10. *Id.* at 14:210.

11. *Id.* at 20:34–35.

12. Pl.'s Ex. 6; Trial Tr. 1:27; 20:169–170.

13. Pl.'s Ex. 6.

14. *Id.* at ¶ 11.

15. Pl.'s Ex. 1; Trial Tr. 1:11.

the renewal of a contract that Maxxim had with Novation, a major hospital group purchasing organization ("GPO") in the Northeast. McCauley printed the SRA, read it, and was concerned about the covenant not to compete. As a result, McCauley attempted to change the duration of the covenant not to compete from one year to thirty days. Maxxim refused.[16] Pilkington told McCauley that even though she had commenced working for Maxxim, that she would not be paid unless she signed the contract with the covenant not to compete.[17]

Around this time, in the third week of July, 2002, McCauley called Bill Booth, a friend who had previously been a Maxxim employee. Booth told McCauley at that time that Maxxim was experiencing a lot of problems with the Novation GPO relationship in the nature of poor service levels, shipment backorders, and product runouts.[18] He then suggested that McCauley insert language into the SRA that would make the covenant not to compete null and void if Novation did not renew the Maxxim GPO contract.[19] As a result, McCauley inserted the following language into her copy of the SRA: "This contract is not enforceable if Maxxim does not retain the Novation contract, which would limit my ability to maintain business in this territory."[20]

McCauley understood at the time that the only person at Maxxim who could approve such a change was Don Chace, who she had earlier interviewed with for the position.[21] However, McCauley never spoke with Chace about the proposed change to the covenant not to compete.[22] She also never received any written approval from anyone at Maxxim for the change.[23] In fact, no one at Maxxim ever told her that her "null and void language" had been approved.[24]

On July 22, 2002, Maxxim recruiting manager, Shira Blumenstein, received a fax from McCauley of the signed SRA without the "null and void" language.[25] In fact, McCauley admitted at trial that the version of the SRA that she faxed to Blumenstein did not contain the "null and void" language.[26]

There were two versions of the SRA received into evidence at trial. Maxxim's exhibit one ("Plaintiff's Exhibit 1") was a fully executed original containing the original signature of Tom Denmark, director of human resources at Maxxim, the original signature of a witness to Denmark's signature, Julie Bartell, and the original signature of McCauley.[27] This exhibit one does not contain the "null and void language." Maxxim's exhibit two ("Plaintiff's Exhibit 2") is the version of the SRA that McCauley maintains was a "duplicate original" of

16. Trial Tr. 1:41–42; 20:27–28.

17. *Id.* at 1:42.

18. Trial Tr. 19:263–268.

19. *Id.* at 1:43–44.

20. Pl.'s Ex. 2, at 5 ¶ 11; Trial Tr. 1:44. This insertion, which McCauley contends makes the noncompete provision "null and void," shall be referred to as the "null and void" language.

21. Trial Tr. 1:45.

22. *Id.* at 1:45–46.

23. *Id.* at 1:46.

24. *Id.* at 1:65; 20:167.

25. Pl.'s Ex. 20, 21; Trial Tr. 10:204–210, 222–224.

26. Trial Tr. 20:171.

27. Pl.'s Ex. 1, at 10.

the only one she signed.[28] It does contain the "null and void" language.[29] However, this version does not contain a signature of a Maxxim representative.

At trial, Bartell, the witness to Denmark's signature, credibly testified that Plaintiff's Exhibit 1 was the only version of the SRA executed by Denmark on behalf of Maxxim.[30] Bartell denied the existence of any handwritten "null and void" inserts.[31] She further testified that the routine practice at the time was to have inserts, if any, retyped into a final document rather than inserting them in handwritten form as is contained in Plaintiff's Exhibit 2.[32] Bartell found this document in Maxxim's HR files around May 19, 2003. Plaintiff's Exhibit 1 was shown to McCauley at a May 20, 2003, meeting with her direct supervisor, Pilkington, and his boss, Timothy Julian.[33] McCauley admits that all of what appears to be her handwriting, initialing, and dating was in fact hers although she denies ever receiving a version with Bartell's and Denmark's signatures.[34]

At trial, Maxxim presented the testimony of a forensic chemist, Albert H. Lyter III, who—based on his knowledge, training and experience-was found by the Court to be well qualified to provide expert testimony in the area of questioned documents, ink and paper analysis.[35] Lyter performed chemical and physical examinations of the originals of Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2. In doing so, he used reliable principles, methods, and techniques universally accepted in law enforcement and the courts.[36] The Court finds his testimony to be credible and persuasive. The testimony was based upon a thorough analysis of the documents and was the product of reliable principles and methods applied reliably to the facts discerned from his examination of the documents.

Based on this analysis, the Court finds that Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2 were not prepared in the same time period using the same materials.[37] In this regard, Plaintiff's Exhibit 2 contains five different ink formulas.[38] Importantly, the ink in "null and void" is different from any other ink on either Plaintiff's Exhibit 1 or Plaintiff's Exhibit 2. And Plaintiff's Exhibit 1 is internally consistent with respect to the inking utilized, including the Bartell and Denmark signatures,[39] the McCauley signature on the signature page, and on internal changes such as the addresses.[40]

Given all of the foregoing with respect to the contract that was actually signed by the parties, the Court concludes based on overwhelming evidence of the facts and circumstances to include the expert analysis of Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2, that the only SRA signed by both parties was Plaintiff's Exhibit 1. Simply stated, Plaintiff's Exhibit 2 was a fabrication created by McCauley to include

28. Trial Tr. 1:52–55; 20:237.

29. Pl.'s Ex. 2.

30. Trial Tr. 2:98–101.

31. *Id.* at 2:100–101.

32. Trial Tr. 2:100–101.

33. *Id.* at 1:108.

34. *Id.* at 1:50–52.

35. *Id.* at 2:113–116, 127.

36. *Id.* at 2:124–125.

37. *Id.* at 2:136–137, 141–144.

38. *Id.* at 2:132–134.

39. *Id.* at 2:145.

40. *Id.* at 2:127–132.

the "null and void" language for the purposes of avoiding the terms of the covenant not to compete.

Although McCauley was aware that she had a contract and that it prohibited her from working for a competing company, she did not convey that information to PHS.[41] Rather, she told the PHS representatives with whom she dealt that there was no reason that she could not come to work for PHS.[42] John Luttgens, Executive Vice President of PHS, did not call Maxxim to inquire about an employment contract. In this regard, he testified that he would feel "uncomfortable" approaching a prospect's employer to make inquiries. He believes, and the Court concurs, that such a contact would alert the current employer that the employee was thinking of leaving.[43]

The Complaint initiating this action was the first communication from Maxxim to PHS relating to McCauley.[44] The SRA was attached to the complaint as an exhibit. It did not contain the "null and void" language. It also did not contain any signatures.[45] Even after PHS was served with the Complaint in this proceeding, McCauley told John Augustine of PHS that "she had added a clause that related to Maxxim's relationship with Novation, and that . . . clause basically stated that if Maxxim were to lose the Novation contract that this employment agreement or sales rep agreement would be null and void."[46] McCauley then provided Augustine a copy of Plaintiff's Exhibit 2 by fax that contains the "null and void" language.[47]

### 3. Custom Procedure Trays

Central to the relief sought by Maxxim in the various counts of the Complaint, is its contention that PHS misappropriated trade secrets in the form of specifications and designs of the CPTs sold to Maxxim's customers within McCauley's sales area. Accordingly, an understanding of what CPTs are and how they are created is necessary to resolve the claims for relief asserted in this proceeding.

A CPT is a prepackaged set of sterile instruments for specific surgical procedures. It is designed by the customer and packaged by the vendor based on directions received from the particular customer purchasing the CPT. CPTs save the user time in operating room efficiency because all of the surgical tools regularly used by a particular surgical team for a specific procedure is contained in the CPT.[48] Each CPT is physician specific, operating room specific, and hospital specific. Accordingly, the tray specifications and designs are created by the institutions that use them.

Several witnesses provided the Court with similar definitions of a CPT. Thomas Guare of Maine Medical ("Guare"), a Maxxim/PHS Customer,[49] defined a CPT as follows:

"It's a procedure tray that is put together as a specification by the hospital for a certain procedure, like a cath lab procedure. . . . [I]t's an aggregation of supplies . . . that clinicians would put to-

**41.** *Id.* at 20:87; 2:20.

**42.** Trial Tr. 2:231.

**43.** *Id.* at 11:226.

**44.** *Id.* at 12:38.

**45.** *Id.* at 12:38–39.

**46.** *Id.* at 12:37.

**47.** *Id.* at 12:46.

**48.** *Id.* at 13:252–253; 19:102–106; Def.'s Ex. 33 at Maxx 1857–58.

**49.** Former customers of Maxxim that left to become customers of PHS with McCauley are referred to as "Maxxim/PHS Customers."

gether, put into a pack and bought as a pack rather than buying all those things individually and having the staff put them together at the time of the procedure." [50]

Sandy Whitney ("Whitney") of Penobscot Bay, a Maxxim/PHS Customer, described a CPT as follows:

Well, a Custom Procedure Tray is used in surgery as well as some other areas of healthcare for assembling products that are used during a procedure, the thought being—behind these pre-assembled kits is that it decreases the amount of time that staff has to assemble products and set up the room for the procedure.

It usually includes all of the draping materials and a lot of the commodity components that are used during the course of a procedure; and it is usually broken up. There's some standard kits that are used by procedure type. In other words, major kits, minor kits, but then there are some very specialized ones getting to total joints, C-sections, and so forth. [51]

Steven Gauthier ("Gauthier") of Central Maine Healthcare, a Maxxim/PHS Customer, describes a CPT as follows:

It's a procedure tray that contains a variety of supply items for a specific procedure. And it could be a surgical type of procedure or ... something in the ER. And these parts or these supplies are all included in one tray so that when the procedure is going to start you have the benefit of opening up one tray

and all the items that you need are there at your fingertips. [52]

Construction of a CPT is done based on the requirements from the customer and, as explained by Maxxim's East Coast Sales Vice President, Julian, is fairly simple, or in Julian's words, "not rocket science." [53] When he was asked "What do you mean when you say it's not rocket science?" He answered: "Well, I said it earlier what the goal here is and you know, you put a bunch of these things together to make it convenient and cost-effective for people that conduct medical procedures. You know, it seems like it makes sense to me." [54] He elaborated: "part of the goal of the custom pack and what's more often the case, is that the people who do these procedures on a daily basis sort of come to a level of agreement to try to standardize as best they can so that the pack can be basically used no matter who is doing the procedure." [55] However, he emphasized: "They are still pretty specific to that facility. Otherwise, it would be a standard pack and not a custom tray." [56] The customer is the ultimate arbiter of the design and contents of the tray. [57]

Thus, a consistent theme of those involved in purchasing CPTs was that they are designed by the customer based on the customer's experiences and needs. For example, Whitney of Penobscot Bay, a Maxxim/PHS Customer, testified that, "[T]he actual configuration or the actual description of what goes in those custom kits comes from us. We are the originator of exactly what components will go in any

---

50. Trial Tr. 11:16–17.

51. *Id.* at 15:17–18.

52. *Id.* at 23:11.

53. *Id.* at 13:100–101.

54. *Id.*

55. *Id.* at 13:102.

56. Trial Tr. 13:102–103.

57. *Id.* at 13:256.

of those kits; and when I say we are, it is the clinicians who actually make the determination as to what's going to be." [58] Whitney testified that the department of surgery indicates and designs exactly what is in a tray. They make additions or deletions based upon their technique and how they perform certain surgical procedures and they are the sole source of how these kits come together. [59]

Echoing this refrain, Rita Renaud ("Renaud"), manager for materials management of Mid Coast Hospital ("Mid Coast"), another Maine Maxxim/PHS Customer, testified that based upon her experience, "the kit or custom pack would be set up the way the clinicians want to use it." [60] Even though there may be a collaborative process, the hospital makes the ultimate decision on the contents of the CPT. [61]

It is also clear, that in no event, were the layouts of the contents of the CPTs owned by Maxxim. This conclusion was a constant refrain among Maxxim/PHS customer hospital representatives who testified at trial. For example, Derrill Maynard of St. Joseph's was asked whether he has an understanding as to who owns the concept of the layout of the CPTs. He answers "[w]e determine the layout. It's our layout. We're open to suggestions by vendors as to how to change the layout, but we are the ultimate determinators (sic) of what that layout will be." [62] He further explained: "These are our trays. These

are our components. We change them at will ... We own them." [63] If a CPT supplier came to him and stated that the supplier owned the concept of the content of the trays, he would say "bullxxxx." [64] In his words, such a position would be "absurd." [65] His answer would be the same if a supplier said that they owned the concept of the layout of the tray. [66]

Mid Coast's Renaud testified when asked to identify the owner of the tray specifications: "I would say that the hospital, driven by the clinicians would own that." In fact, neither Maxxim nor any other tray supplier ever advised her that the supplier owned the tray specifications. [67] She testified that she would be surprised to hear that Maxxim takes the position that Maxxim owns the tray specifications. [68] Her surprise arises from the fact the clinicians dictate what is in the packs. They dictate the setup. [69] "It's never been my understanding in dealing with custom packs that the lists were proprietary by the supplier." [70]

Penobscot Bay's Whitney similarly testified that the tray specifications belong to Penobscot Bay. [71] As stated by Whitney:

I am absolutely convinced that the tray contents—that the tray specifications is something that is Penobscot Bay Medical Center, and I can't imagine that anybody else would think that they did own those specifications. This is a prod-

---

58. *Id.* at 15:54–55.

59. *Id.* at 15:57.

60. *Id.* at 18:32.

61. *Id.* at 23:228.

62. *Id.* at 27:80–81.

63. *Id.* at 27:78–79.

64. *Id.* at 27:81–82.

65. *Id.*

66. *Id.*

67. *Id.* at 28:48.

68. Trial Tr. 28:49.

69. *Id.*

70. *Id.* at 28:229.

71. *Id.* at 15:96.

uct that we contract for. No one else owns that information. We determine what we want in those kits and how we want it put together. So I can't imagine that anyone else would have ownership to that.[72]

Maine Medical's Guare similarly testified that "These packs have been established over the years by clinical staffs."[73] From his perspective, Maine Medical owns the tray design. He has never had a supplier state to him that the supplier owns the tray design or the tray contents.[74] If a tray supplier were to advise him that it was a trade supplier's position that the tray contents were the supplier's proprietary information, his reaction would be, "[w]e would not do business with them."[75] He provided two primary reasons for not doing business with such a tray supplier. First, the RFP process would have to be "generic." Second, the clinical staff would not use a pack unless it included the types of products that they typically use.[76]

Central Maine's Gauthier was asked similar questions with similar answers. In response to the question: "In your own mind who is the owner of the information set forth on a Bill of Materials, that is the designation of the tray contents?" He answered: "They [i.e., the hospital's clinicians] are the owners of that information. They develop it and they generate it."[77] When asked to elaborate Gauthier testified:

"These [CPTs] are based specifically on a particular customer's clinical method-ology. The contents are in there based on the customer's preference. Usually they are items that the customer already uses, and the customer designs these trays specifically as to how they do business, how they prep for a case, how they support a surgical procedure. So to the customers, the trays have to work for the customer by definition of custom tray. That's why we don't go and get a standard procedure tray off a vendor's shelf is because we want something that is customized to our way of doing business."[78]

With regard to tray design, Gauthier testified that the hospital is the owner of the design. He testified: "Again, we are determining the layout because it is based on how we open a procedure, how we begin, how we facilitate that procedure. So we would be the ones that would determine that. In my mind, it is ours."[79]

Consistent with this, Maxxim does not enter into confidentiality agreements with its hospital customers with respect to the content and design of the CPTs they order.[80] In this regard, numerous hospital witnesses testified that they never had any understanding that they were to keep information relating to the CPTs confidential.[81]

A related contention is that the bills of materials prepared in connection with the CPTs sold by Maxxim to its customers are also trade secrets. A bill of materials is a

**72.** *Id.* at 15:98.

**73.** *Id.* at 11:38–39.

**74.** *Id.* at 11:43.

**75.** *Id.* at 11:43–44.

**76.** *Id.* at 11:44.

**77.** *Id.* at 23:15.

**78.** Trial Tr. 23:15.

**79.** *Id.* at 23:16.

**80.** *Id.* at 14:150, 152.

**81.** *Id.* at 28:35–36; 15:56; 11:43; 23:14.

list of components in the CPTs.[82] They are based on the customer's design of the CPT.[83] They are the end result of the customer's specifications as to the contents of a particular CPT.[84] While a detailed version is kept by Maxxim that includes specific component costs, the bills of materials that were "presented" to customers did not include the price information.[85] In this respect, they were referred to at times as "presentation bills of materials."[86]

Bills of materials are routinely provided to customers in connection with the sale of CPTs. They are made available to customers on request.[87] They are used by the customers for a variety of purposes. For example, customers use the bills of materials in dealing with Maxxim about the CPT content.[88] Customers need them to confirm that particular CPTs contain the necessary surgical instruments.[89] Similarly, they are used by the customer when the customer wishes to make a change to the composition of a CPT.[90] Customers would also use them in making cost comparisons between the total cost of a particular CPT and the cumulative cost of each of the CPT's component parts.[91]

Importantly, it was industry practice for the hospital customers to use the bills of materials to solicit prices for CPTs from competing suppliers.[92] In fact, they were used by hospitals in connection with requests for proposals that hospitals would make to various suppliers with respect to CPTs.[93] Simply put, the use of a bill of materials is the customer's prerogative.[94] A customer can give a bill of material to whomever the customer wants.[95]

And bills of materials were not treated by Maxxim or its customers as being confidential. In this regard, they were not designated as "confidential."[96] In fact, numerous witnesses confirmed that the bills of material did not have any type of designation suggesting that their contents were confidential or proprietary.[97] Likewise, numerous witnesses also testified that Maxxim representatives never discussed with them the issue of confidentiality or trade secrets.[98] Similarly, Maxxim produced no CPTs with designations suggesting that the contents or design were "confidential" or "proprietary."[99] As testified to by Penobscot Bay's Whitney, "[i]f you knew anything about this business, you know that the whole notion about the contents and what is in our kits and how they're packed as being some secretive

**82.** *Id.* at 21:21–22; 28:23; Def.'s Ex. 7, 110, 286.

**83.** *Id.* at 10:93.

**84.** *Id.* at 13:52–53.

**85.** *Id.* at 10:157–158.

**86.** *Id.*

**87.** *Id.* at 14:169.

**88.** *Id.* at 10:99–100.

**89.** Trial Tr. 18:66–67.

**90.** *Id.* at 10:93–94; 18:30.

**91.** *Id.* at 18:59–61.

**92.** *Id.* at 12:161–163; 13:56–57; 21:21–22, 177–178.

**93.** *Id.* at 18:69–72; 10:95–96, 162–163; 21:177–178.

**94.** *Id.* at 13:50; 12:156–157.

**95.** *Id.* at 12:157.

**96.** *Id.* at 10–70.

**97.** *Id.* at 12:164; 17:82–83; 18:34–35; 21:45; 15:51; 10:95; 11:193; 23:14.

**98.** *Id.* at 27:83; 28:34–35, 41; 21:45; 15:52; 14:153; 11:44–45; 23:11.

**99.** *Id.* at 21:45–46; 10:95.

and confidential information, is just foolish." [100]

The hospitals often provide a sample CPT to a potential supplier. [101] When a sample tray is provided, a supplier such as PHS will review the design and mimic its contents in the preparation of a sample tray to be provided to the hospital as a prototype. [102] Julian who was employed by Maxxim at one time, testified:

> Just from my personal experience, sometimes they would literally give us a tray. [Pilkington] and I, for example, on numerous occasions had a carload of trays from an account that wanted us to basically tear those apart and reconstruct them our way. The whole purpose of that was to build a prototype so that we could make sure that the way we put it back together our way was satisfactory to them before it went into production. So we would get information from the account, up to and possibly including a physical tray that they would say, "Here. Take it. Rip it apart and see what's in there, and make sure that you get it right." [103]

Maxxim also asserts that McCauley had access to Maxxim's CTMS system that contained confidential trade secrets. [104] The CTMS system was an automated system that permitted Maxxim sales representatives to use their laptops for quoting and making changes in trays, and to communicate electronically with Maxxim's Clearwater production facilities. [105] This information available through the CTMS system included CPT contents, which as discussed above, were never treated as confidential by either the hospitals or suppliers.

Maxxim also contends that McCauley had access to computer-aided design/computer-aided manufacturing software ("CAD/CAMS") for each CPT they supplied. CAD/CAM software displayed a three-dimensional view of each CPT and its component positioning, and, Maxxim contends, was a valuable selling tool. [106] However, the hospital representatives who testified were never aware of CAD/CAM drawings used in connection with the preparation or sale of CPTs. [107] Moreover, McCauley was never shown any CAD/CAM drawings of Maxxim CPTs, and she never knew that any such drawings were available to her. [108] Further, she has never seen a CAD/CAM design used in connection with providing a CPT to a hospital. [109]

It is clear from the testimony that such CAD/CAM drawings were of little value in that they were antiquated, [110] not available over the internet, [111] not retrieved by Maxxim sales personnel, [112] and never used in connection with the sale or manufacture of CPT's in McCauley's sales area. [113] As PHS's John Abele explained: "If you look

---

**100.** *Id.* at 25:228–230.

**101.** *Id.* at 21:25–26.

**102.** *Id.* at 106.

**103.** Trial Tr. 13:58–59.

**104.** *Id.* at 13:11–113.

**105.** *Id.* at 13:263–264.

**106.** *Id.* at 3:49–52; 4:22–23; 13:274–276.

**107.** *Id.* at 15:60–61 (Whitney of Penobscot Bay); *Id.* at 27:56–57 (Maynard of St. Joseph's); *Id.* at 28:81 (Renaud of Mid Coast).

**108.** *Id.* at 20:50.

**109.** *Id.*

**110.** *Id.* at 21:35.

**111.** *Id.* at 10:182–183.

**112.** *Id.* at 10:183–184.

**113.** *Id.* at 21:34–35, 132.

at the contents of a procedure tray, they are pretty simple and straight forward. If you don't have a sample and you're just working off tray specifications, a supplier can determine the architecture pretty easily. Once you build a prototype, and it is presented to the clinicians, the clinicians will tell you if it's not built to their specifications."[114]

Another contention of Maxxim is that Maxxim's GPO agreement with Novation that was terminated in December of 2003, required the parties to keep confidential the CPT contents and design. The evidence does not support this contention.

In this regard, the Novation GPO agreement ("Novation Agreement") only extended confidentiality to: (1) prices and usage; (2) information relating to "programs;" and (3) the prices the supplier charges distributors.[115] Only the first two are relevant to this case. Neither applies to CPTs. Rather, Novation was seeking to protect information about its programs that Novation considered confidential. Specifically, Novation sought to protect from disclosure "anything that they put together" such as rebates, the sales tracings incentives, and guaranteed price savings.[116] The CPT contents or CPT architecture simply do not relate to any of the items that fell within the Novation Agreement confidentiality provision.[117]

Consistent with this interpretation is the manner in which Novation and Maxxim dealt with the provision governing the parties' confidentiality obligations upon termination of the Novation Agreement in late 2003. In this regard, the Novation Agreement contains a provision that provides that "not later than thirty (30) days after the expiration or earlier termination of this Agreement, return to the other party, as the case may be, the Confidential Information."[118] There was no evidence at trial that either Maxxim or Novation ever sought the return of any materials relating to CPTs post-termination.[119] Similarly, when a hospital terminated its contract to purchase CPTs from Maxxim, there were never any post-termination procedures that required the return of any CPT bills of materials.[120]

It is clear, therefore, that the CPT contents as well as the other information obtained by McCauley during the time of her employment by Maxxim were not trade secrets.

4. Cause of Maxxim's Loss of Maine Business

a. Supply Problems

That Maxxim was having problems in its ability to meet customer supply demands is not surprising. The period immediately following McCauley's commencement of employment as a sales representative happened to coincide with the period immediately preceding Maxxim's Chapter 11 filing. As with most businesses approaching a bankruptcy filing, Maxxim was having financial problems. There was a cash crunch.[121] This caused supply problems that hindered Maxxim's ability to deliver

114. *Id.* at 21:175.

115. Def.'s Ex. 61, *Novation Contract,* at MAXX–03667.

116. Trial Tr. 21:63.

117. *Id.;* 21:65.

118. Def.'s Ex. 61, *Novation Contract,* at MAXX–03667.

119. *See, e.g.,* 23:31, 46; 11:192.

120. Trial Tr. 23:31; 11:192; 10:177–178; 14:191; 27:74; 21:46–47.

121. *Id.* at 6:61.

product on a timely basis.[122] To generate cash flow, Maxxim was in a cost-cutting mode. As a result, there were delays in deliveries.[123] Another concern was that Maxxim was not timely paying fees due to Novation. At any given time, Maxxim would be 60 or 90 days in arrears on those payments.[124]

### b. Service Quality Problems

In addition to supply problems, there were significant issues with respect to the way Maxxim was performing as a supplier of CPTs to its Maine customers. Penobscot Bay was one of McCauley's customers that made a decision to stop buying from Maxxim, in part because of these problems. Penobscot Bay's Whitney testified about the reasons that Maxxim lost Penobscot Bay's business as follows:

> Maxxim was not doing the job. We had a poor quality product coming in here on an ongoing basis as you can see by all of these product occurrence reports. They lost—the contract with VHA was not renewed. It was not renewed because the membership was—there was an outcry from the membership about the quality of service that Maxxim was providing. The last ingredient in this was Maxxim was filing for bankruptcy. No one in their right mind in materials would champion continuing with Maxxim after those three factors played out.[125]

Greatly exacerbating general service quality problems during this period of financial and operational crisis, was a project designed to save Maxxim money through a systematic program of misleading its customers about the contents of the CPTs being sold to them by Maxxim. Maxxim named this scheme "Project Stanley." Simply put, under Project Stanley, Maxxim substituted less expensive, unapproved instruments for those that had been specified by the customer. In this respect, Project Stanley violated Maxxim's assurances to its customers that there would be no substitute tray components.[126] An intra-company memorandum described Project Stanley as "an attempt to improve margins by making unauthorized substitutions of components in custom procedure trays." [127] In addition to this being a deceptive practice with respect to customers, it also violated the Novation Agreement guidelines for product substitutions.[128] Further, Novation's contract manager, John Thompson, became aware of Project Stanley during the bid process for CPTs that occurred in late 2002.[129] Thompson was incredulous that Maxxim would actually implement a program like Project Stanley in the middle of the bid process.[130]

### c. Novation Agreement

As events unfolded, McCauley's concerns about Maxxim's ability to retain the Novation Agreement were well founded. In November of 2002, Novation awarded a GPO contract to a number of exclusive vendors. However, while Maxxim had bid for the contract, they were excluded in the final bid selection. On the other hand,

**122.** *Id.* at 7:14–15.

**123.** *Id.* at 6:61.

**124.** *Id.* at 11:82–83.

**125.** Trial Tr. 16:203.

**126.** *Id.* at 12:228.

**127.** Def.'s Ex. 33 at MAXX–01900; Trial Tr. 19:101.

**128.** Def.'s Ex. 61, Ex. B.

**129.** Trial Tr. 21:70–71; Def.'s Ex. 34 at MAXX–01048.

**130.** Trial Tr. 21:73.

PHS was approved as a Novation CPT supplier for the period 2003–2005.[131]

Indeed, the Novation Agreement was critical to Maxxim's ability to compete within McCauley's sales area. Without a group buying contract with an organization such as Novation, a supplier such as Maxxim is shut out from much of the market.[132] Novation is the largest GPO in the market.[133] In the Northeast, more than 75 percent of Maxxim's CPT business came through Novation. That was "particularly true in Maine."[134] Maine had higher participation in Novation than other states.[135] A common theme expressed by the Maine Medical director of supply management, "Yes ... we buy from Novation and would only buy from Novation."[136] In fact, for several years, Maine Medical had only purchased CPTs from Novation suppliers.[137] As a result, "When the contract ran out with Novation, the decision to pick the next vendor, I made the decision that Maxxim would not get an RFP."[138]

The loss of the Novation Agreement placed both Maxxim and its customers in a difficult situation. While customers logically would seek CPTs from other suppliers within the Novation GPO, as a result of the timing of the Novation non-renewal, there appeared to be insufficient time for proper transition planning to occur. This placed both the hospitals and Maxxim in a difficult position. Maxxim needed the hospitals to make a decision quickly so that it could make appropriate decisions about capacity management and staffing. The hos-

pitals needed a dependable source for their CPTs. As a result, Maxxim developed yet another sales strategy that had a negative effect on its customer base. Specifically, Maxxim issued a demand to its customers that they commit to ordering CPTs from Maxxim by the end of January 2003.[139] The strategy backfired. A typical response is that of Maine General:

> Karen, to be frank with you, when I read the letter I was pretty ticked. To me, if Maxxim wanted to retain the business they would not be trying to force loyal companies such as Maine General into a corner to make a decision before we even reviewed the launch agreement. You and I both know that we have plenty of breathing room, as it would take four to six months to transition over to a new supplier, if we choose to go that route, which we haven't yet.
>
> We shouldn't have to commit to anything at this point with an eight-week window, since this is the pipeline time which we are committed to buying should we cancel. Beyond eight weeks, yes I would agree, we should negotiate that in the absence of an agreement.[140]

### d. Loss of Other Sales Representatives

McCauley was one of many sales representatives to leave Maxxim during this period. The evidence at trial was that there were at least 18 other sales representatives who left Maxxim's employment in 2001 through 2003.[141] Several were

---

131. *Id.* at 1:88–89.

132. Trial Tr. 21:10. 265.

133. *Id.* at 21:10–11.

134. *Id.* at 12:239–240.

135. *Id.* at 12:240.

136. *Id.* at 11:23–24.

137. *Id.* at 11:23.

138. *Id.* at 11:24.

139. Def.'s Ex. 33 at MAXX–1901–02.

140. Def.'s Ex. 265; Trial Tr. 20:123–124.

141. Trial Tr. 21:89–109.

sales managers for Maxxim.[142] Most went to key competitors such as Cardinal, Avid, ACS, and Medline.[143] In the process, they collectively converted to their new employees numerous Maxxim customers with millions in sales revenues.[144] However, it does not appear that Maxxim sued any of them for their actions.[145]

### e. Maxxim's Chapter 11 Filing

Maxxim's competitive position was further adversely impacted by its Chapter 11 filing on February 11, 2003. The events leading up to Maxxim's Chapter 11 filing appear to relate back to November of 1999 when Maxxim was purchased through a leveraged buyout. As a result, Maxxim increased its debt load significantly. Matters were made worse by a generally widespread effort in the public and private sectors to control healthcare costs. These efforts led many of Maxxim's customers, primarily hospitals, surgery centers, and other healthcare providers, to join group buying organizations such as Novation in order to obtain price concessions. As discussed above, the Novation termination was a major factor that led Maxxim to file for Chapter 11.[146] As a result, Maxxim experienced constraints on profit margins.[147]

The effect of the Chapter 11 filing was staggering. According to the crisis manager employed as Maxxim's chief financial officer in conjunction with Maxxim's Chapter 11 filing, "It took us three or four months to get our supply base back and to get them to provide product at a timely basis." [148] Further compounding Maxxim's problems is that it lost more Novation business than anticipated and lost the business faster than had been predicted.[149]

Moreover, it appears that among the types of medical products provided by Maxxim, the CPT business was the "most sensitive to our bankruptcy process." [150] This sensitivity was due to "lack of cash flow, funds to deal with the customers on a timely basis." [151] Bankruptcy created the perception that Maxxim could not deliver product on time.[152] As stated by one customer representative: "[B]ankruptcy in the CPT business is a very important factor in whether we would choose to do business with a vendor." [153]

According to an internal executive summary prepared for Maxxim's board of directors, the critical element to preserving the tray business was to preserve the chain of supply. However, Maxxim was unable to assure a chain of supply and "resultantly, the company has been unable to protect its book of business." [154] The executive summary also states: "The Company cannot sustain itself, particularly in the CPT market, without a speedy resolution of its bankruptcy status." [155]

142. *Id.* at 21:92–93, 96–98, 100–101.

143. *Id.* at 21:89–109.

144. *Id.*

145. *Id.* at 21:111–112.

146. *Id.*

147. Def.'s Ex. XX at para. 26; *see also* Trial Tr. 24:230.

148. Trial Tr. 7:41.

149. *Id.* at 7:42.

150. Def.'s Ex. 197 at MAXX–21493; Trial Tr. 7:44.

151. Trial Tr. 7:44.

152. *Id.* at 7:45.

153. *Id.* at 11:92.

154. Trial Tr. 7:45–46.

155. Def.'s Ex. 197 at MAXX–21454.

Consistent with this theme, the sales representative who replaced McCauley testified that he was sure that customers were concerned about the Chapter 11.[156] He testified that he did not think many customers were "really upset with Maxxim, but I think there were some people that were concerned about what was going on with the Chapter 11 and the lack of Novation contracts."[157] The supply problem was also noted: "Well, we had problems getting products so we didn't have stuff to sell so it affected sales."[158]

### f. The Defendants' Role in Maxxim's Termination

The evidence does not suggest any causal link between PHS's actions and Maxxim's loss of the Maine business. The same applies to McCauley's activities. In this regard, the testimony of the Maine Medical representative is illustrative. In the case of Maine Medical, the decision to purchase CPTs from PHS came after the decision to terminate the Maxxim relationship. Maine Medical decided to cease purchasing CPTs from Maxxim in December 2002. In 2003, Maine Medical engaged in another process to select a new vendor. Maxxim and Medline were not invited to participate.[159] PHS was picked at the end of the process "because they were the best business deal that met our specifications."[160] Midcoast Hospital echoed this refrain. That is, neither McCauley nor PHS played any role in the decision not to invite Maxxim to participate in the RFP.[161]

Similarly, Maine Medical engaged in an RFP process during 2003 for the supply of CPTs. Three suppliers were invited: Cardinal, DeRoyal, and PHS.[162] Maxxim was not one of them.[163] The reason Maxxim was not invited was because "they weren't a Novation supplier, number one, and number two, their quality had really—it wouldn't have mattered if they were, their quality had really fallen off during the year."[164] "Maxxim began substituting different items in the pack rather than items we were accustomed to. They also had some quality problems. We found hair in some of the packs or in one or two of the packs. There were some punctures in the table covers, punctures in the outer packaging. There were quality issues."[165]

Maine Medical's criteria for selecting a vendor was pricing, service, reliability, and Novation.[166] As discussed above, Maxxim had significant problems in each of these areas. Moreover, any information that McCauley gave Maine Medical concerning PHS did not assist Maine Medical in making the determination to switch to PHS. "It was ... the choice of PHS was done by my staff and their due diligence in looking at the vendor."[167] Maine Medical did not choose PHS because McCauley was going to be the account representative.[168] Both Cardinal and DeRoyal had sales represen-

---

156. Trial Tr. 10:76.

157. *Id.* at 10:77.

158. *Id.* at 10:80.

159. *Id.* at 11:27.

160. *Id.* at 11:123–124, 139.

161. *Id.* at 18:90–91; 23:30.

162. *Id.* at 23:22.

163. *Id.* at 23:23.

164. *Id.*

165. Trial Tr. 23:23.

166. *Id.* at 11:127.

167. *Id.* at 11:157.

168. *Id.* at 11:177–178.

tatives who had begun to get "traction."[169] Maine Medical chose PHS because "De-Royal was weak and Cardinal was an iffy proposition at Maine Medical Center."[170] In a similar vein, Penobscot Bay was not influenced by either PHS or McCauley in its decision to cease purchasing CPTs from Maxxim.[171]

Maxxim's argument that the loss of business in Maine was an "enigma"[172] simply ignores the overwhelming evidence to the contrary. That is, it was clearly established at trial that Maxxim was terminated due to: (1) poor quality; (2) loss of the Novation Agreement; and (3) the filing of Maxxim's Chapter 11.[173] Neither PHS nor McCauley were in any way responsible for these factors. It was Maxxim's own failures rather than any action by the Defendants that resulted in the loss of the CPT business in Maine.

## CONCLUSIONS OF LAW

### I. Jurisdiction.

The parties are in agreement and the Court finds that it has jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334 and that this adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(A) and (O).[174]

### II. Maxxim's Claims for Relief.

In its conclusions of law, the Court will first deal with the issue of causation as it is an element of each of the Plaintiff's claims for monetary relief. The Court will then address each of the Plaintiff's claims for relief separately and explain the Court's conclusion that the evidence before the Court does not support relief for the Plaintiff under any of its claims for damages. Finally, the Court will address Maxxim's prayer for injunctive relief and conclude that under the circumstances of this case, it is not warranted.

### 1. Causation.

Maxxim has brought several claims for relief based on facts that it contends demonstrate that PHS wrongfully misappropriated Maxxim's Maine CPT business. A common element of these claims is the requirement that there be proof that Maxxim's loss was caused by the Defendants' actions. That is, an essential element to the various claims brought by Maxxim in the case is causation.[175]

Maxxim has failed to carry its burden of proof on the element of causation on its various claims for relief filed in this proceeding. In this respect, Maxxim's loss of the Maine business was not caused by the actions of either McCauley or PHS. Rather, Maxxim's loss was due to a combination of the following: (1) Maxxim's loss of its contract with Novation for the supply of CPT's; (2) Maxxim's Chapter 11 filing; and (3) Maxxim's inability to adequately service and supply its customers. Customers affirmatively testified that McCau-

---

**169.** *Id.* at 11:187.

**170.** *Id.*

**171.** *Id.* at 15:104.

**172.** *Id.* at 12:242–243; 14:24–25.

**173.** *Id.* at 16:203–204; 23:78, 105.

**174.** Compl., Doc. No. 1, ¶¶ 4 and 5; Ans., Doc. No. 4, ¶¶ 4 and 5.

**175.** *Florida East Coast Ry. Co., v. Peters,* 77 Fla. 411, 83 So. 559, 563 (1919) ("Before liability in damages … can arise, it is necessary that a [sufficient] causal relation … should exist between the damage complained of and the act alleged to have occasioned the damage."); *see generally* 12 Fla. Jur. 2d *Damages* § 12 (2004) ("The party seeking recovery must prove the extent of his or her injuries and that they were proximately caused by the [bad acts] of the opposite party.").

ley and PHS played no role in their decision to terminate Maxxim.

### 2. Legal Conclusions on Individual Counts.

#### a. Counts I and II (McCauley)— Breach of Contract

■ In Count I, the Plaintiff alleges that the SRA contained a covenant restricting McCauley's use of confidential and proprietary information obtained from Maxxim, that McCauley breached this obligation by using such information while in the later employment of PHS, and that Maxxim suffered pecuniary loss as a result of McCauley's wrongful breach of her contractual obligation.[176]

■ As discussed in the foregoing Findings of Fact, Maxxim has failed to prove that McCauley had access to confidential or proprietary information obtained during her employment with Maxxim. Clearly the CPT designs as well as the related bills of materials were not trade secrets.[177] Nor were they considered confidential by any of the various persons that dealt with them. The existence of the hospitals that made up McCauley's customer list was certainly not confidential. Hospitals regularly disclose such information in requests for proposals. Such information is therefore readily ascertainable by proper means and is not considered confidential information. Most importantly, as discussed in the section above dealing with causation, McCauley's actions simply did not result in any damages to Maxxim. That is, Maxxim

has failed to prove a critical element of its prima facie case, that is, causation.[178]

■ Count II of the Complaint is also for breach of contract by McCauley. However, it is based on that portion of the contract that contains a covenant not to compete. Maxxim contends that McCauley's conduct in competing with Maxxim and soliciting customers for PHS violated that contractual obligation and that Maxxim suffered pecuniary loss as a result of McCauley's wrongful breach of her contractual obligation.[179]

In its Findings of Fact, the Court has concluded that the SRA contained a noncompete covenant. McCauley left her position with Maxxim to take a position with a competitor in violation of that contractual obligation. However, to maintain an action for enforcement of a covenant not to compete, more is required. Specifically, a party seeking enforcement of a restrictive covenant must plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant.[180]

The term "legitimate business interest" includes, but is not limited to (1) trade secrets, (2) valuable confidential business or professional information that otherwise does not qualify as trade secrets, (3) substantial relationships with specific prospective or existing customers and (4) customer goodwill.[181] Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforcea-

---

**176.** Compl., p. 45.

**177.** See discussion *infra* with respect to Maxxim's claim under the Uniform Trade Secrets Act.

**178.** *Superior Uniforms v. Brown,* 211 So.2d 50, 52 (Fla. 3d DCA 1968) (finding that the purchaser of a uniform rental business had "failed to show a causal connection between

the damages claimed" and the seller's acts that allegedly violated his agreement not to compete).

**179.** Compl., p. 51.

**180.** Fla. Stat. § 542.335(1)(b) (2003).

**181.** *Id.*

ble.[182] In addition, a person seeking enforcement of a restrictive covenant also must prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction.[183] Maxxim failed to prove any legitimate business interest worthy of protection by a covenant not to compete.

■ Although, under Florida law, confidential business information may be a legitimate business interest that will support a covenant not to compete, "information that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection." [184] The information that Maxxim identifies as "confidential" is well-known in the industry and is not "unique" to Maxxim. Therefore, there is no confidential information to support the covenant not to compete. Maxxim did not convey to McCauley any trade secrets that would support a covenant not to compete.

■ In addition, as discussed above, McCauley's actions simply did not cause any damages to Maxxim. That is, just as with Count I, Maxxim has failed to prove it critical element of its prima facie case, that is, causation.[185]

### b. Count III (McCauley)—Breach of Fiduciary Duty

■ Count III of the Complaint is for breach of fiduciary duty by McCauley. In this count, Maxxim alleges that McCauley breached her fiduciary duty, diverted corporate opportunities away from Maxxim, solicited Maxxim's customers, and used confidential and proprietary information that belonged to Maxxim, and that these actions caused it to suffer pecuniary loss.[186]

■ The relationship between Maxxim and McCauley establishes, at most, an independent contractor relationship. Such agreements do not automatically give rise to fiduciary obligations.[187] This is because parties in such a relationship contract at arms' length.[188] Even within a relationship generally characterized as confidential, the purpose of the disclosure, the past practice of the parties, the customs of the industry, and the other circumstances of the disclosure remain relevant in determining the recipient's obligations.[189] "Information that forms the general skill, knowledge, training, and experience of an employee cannot be claimed as a trade secret by a former employer even when the information is directly attributable to an investment of resources by the employer in the employee." [190] "[I]t is not ordi-

---

182. *Id.*

183. Fla. Stat. § 542.335(1)(c).

184. *Autonation, Inc. v. O'Brien,* 347 F.Supp.2d 1299, 1304–1307 (S.D.Fla.2004) (citations omitted). *See also Hapney v. Central Garage, Inc.,* 579 So.2d 127, 134 (Fla. 2d DCA 1991).

185. *See Florida East Coast Ry. Co.,* 83 So. at 563; *Superior Uniforms,* 211 So.2d at 52.

186. Compl., p. 58.

187. *See Amoco Oil Co. v. Gomez,* 125 F.Supp.2d 492, 509 (S.D.Fla.2000), 379 F.3d 1266 (11th Cir.2004).

188. *Id.*

189. Restatement (Third) of Unfair Competition § 41 cmt b (emphasis added). *See also Electro–Craft Corp. v. Controlled Motion, Inc.,* 332 N.W.2d 890, 901 (Minn.1983).

190. Restatement (Third) of Unfair Competition § 42 cmt d (emphasis added). *See also id.* cmt c ("Former employees are entitled to exploit their general skill, knowledge, training, and experience even when acquired or enhanced through the resources of the former employer.").

narily regarded as a breach of loyalty to 'disclose' information that is common knowledge or that the employee has no reason to believe is confidential."[191]

At trial, there was overwhelming testimony that information relating to the CPTs was not considered a trade secret by the suppliers and customers in the CPT market. There is no factual support for the contention that Defendants knew or had reason to know that any information relating to CPTs or other information obtained by her during her employment with Maxxim was a trade secret.

■ Most importantly, as discussed in the section above dealing with causation, McCauley's actions, even if otherwise actionable, simply did not result in any damage to Maxxim. That is, Maxxim has failed to prove a critical element of its prima facie case, that is, causation.[192]

### c. Count IV(PHS)—Aiding and Abetting

■ Count IV of the Complaint is for aiding and abetting McCauley's breach of fiduciary duty by PHS. In this claim, Maxxim alleges that PHS knew about McCauley's fiduciary duty to Maxxim and assisted and benefited from McCauley's breach of that fiduciary duty, and that as a result of PHS's wrongful conduct, Maxxim has suffered pecuniary loss.[193]

■ This claim for relief fails for several reasons. First, there can be no claim for relief for aiding and abetting a breach of fiduciary duty once the Court determines that McCauley did not breach her fiduciary duty. Second, although McCau-

ley was aware that she had a contract and that it prohibited her from working for a competing company, she did not convey that information to PHS.[194] Thus, Maxxim's assertion that "PHS knew of the existence of Defendant McCauley's fiduciary duty to Maxxim," is simply unsupported by the record.[195] Finally, there is also no support in the record for Maxxim's assertion that "PHS rendered substantial assistance to Defendant McCauley in connection with her breach of fiduciary duty."[196] In this regard, PHS simply employed McCauley as its sales representative in the Maine territory without knowledge of any contract that would prohibit such employment.

■ In addition, any action by PHS did not result in any damages to Maxxim. That is, Maxxim has failed to prove a critical element of its prima facie case, that is, causation.[197]

### d. Count V (PHS and McCauley)— Interference with Contractual and Advantageous Relationships

Count V of the Complaint contains two claims for relief. The first claim set forth in this count is for tortious interference by PHS with McCauley's SRA with Maxxim. In this portion of Count V, Maxxim alleges that PHS had knowledge of the existence of McCauley's SRA and that notwithstanding this knowledge, induced McCauley to terminate her employment with Maxxim and to work instead for PHS. The second claim set forth in Count V is for tortious interference by both PHS and McCauley with Maxxim's advantageous business rela-

---

**191.** *Id.* cmt b.

**192.** *See Florida East Coast Ry. Co.,* 83 So. at 563; *Superior Uniforms,* 211 So.2d at 52.

**193.** Compl., p. 65.

**194.** Trial Tr. 20:87; 2:20.

**195.** *Id.* at 2:231.

**196.** Compl., p. 63.

**197.** *See Florida East Coast Ry. Co.,* 83 So. at 563; *Superior Uniforms,* 211 So.2d at 52.

tionships with its customers. Maxxim alleges that this wrongful conduct has caused it to lose employees and customers and to suffer pecuniary loss.[198] The separate claims for relief will be addressed in order below.

### 1) Tortious Interference by PHS with McCauley's SRA

■ In this portion of Count V, Maxxim asserts a claim that PHS tortiously interfered with Maxxim's contract with McCauley. Under Florida law, the elements of the tort of interference with contract are: (a) the existence of a contract; (b) the defendant's knowledge of the contract; (c) the defendant's intentional procurement of the contract's breach; (d) absence of any justification or privilege; and (e) damages resulting from the breach.[199] The principal elements of this tort that Maxxim has failed to prove are discussed below.

### a) PHS's Knowledge of the Covenant Not to Compete

■ At a minimum, a plaintiff must prove purposeful interference with a *known* right.[200] There is no evidence that McCauley informed PHS about the covenant not to compete contained in the SRA. To the contrary, it was McCauley's position during her initial discussions with PHS as it has been in this litigation that any limitation on her employment as set

forth in the SRA expired when Maxxim lost the Novation contract. While this Court has ruled that McCauley's position is not supported by the language of the SRA that she executed, it is clear that McCauley also represented to PHS that there were no restrictions on her employment resulting from her prior employment with Maxxim.

■ Under these circumstances, PHS cannot be held liable for tortious interference with any contract between Maxxim and McCauley. While it may be true that a defendant need not know the "legal significance" of a contractual relationship to be found liable, a plaintiff must prove that the defendant was aware of such facts that can support a finding of "willfulness." PHS was told that any contract was void or had lapsed. Any alleged interference was not "willful."

### b) PHS's Intentional Procurement of the SRA's Breach

■ Any alleged interference with the SRA was not the direct result of any action taken by PHS. "In order to maintain an action for tortious interference with contractual rights, a plaintiff must prove that a third party interfered with a contract by 'influencing, inducing or coercing one of the parties to breach the contract, thereby causing injury to the other party.'"[201] PHS did not seek out McCau-

**198.** Compl., p. 78.

**199.** 32 Fla. Jur. 2d *Interference* § 1 (2005). *See also Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir.1998); *Mariscotti v. Merco Group at Akoya, Inc.*, 917 So.2d 890, 892 (Fla. 3d DCA 2005); *Farah v. Canada*, 740 So.2d 560, 561 (Fla. 5th DCA 1999).

**200.** See *McDonald v. McGowan*, 402 So.2d 1197, 1201 (Fla. 5th DCA 1981) ("[a]ctual ill-will or fraud is not essential element of tort of interference with contract where record

shows purposeful interference with prior known contract right."); *Steffan v. Zernes*, 124 So.2d 495, 498 (Fla. 1st DCA 1960) ("[t]he gravemen of an action for tortious interference with a contract between other persons whereby one contracting party is induced to breach the contract to the injury of the other, and when the act of the person inducing the breach of contract is intentional, malice will be inferred.").

**201.** *Farah*, 740 So.2d at 561 (finding no tortious interference with contract because one of the parties to the contract was pre-disposed

ley. McCauley sought out PHS for employment. McCauley was determined to leave Maxxim whether she was hired by PHS or not.[202] Under these circumstances, Maxxim has failed to prove that PHS induced any breach of any employment agreement.[203]

### c) Absence of Justification or Privilege

 Justification or privilege to interfere with a contract is an affirmative defense to a tortious interference action. A competitor is privileged to hire away an employee whose employment is terminable at will.[204] That is, the actions of PHS in employing McCauley, standing alone, cannot be the basis for a claim for relief in favor of Maxxim. While PHS sought to advance its own business interests when it hired McCauley, it was justified in doing as long as it did not intentionally and knowingly interfere with Maxxim's contractual rights.

### d) Damages

 Most importantly, as discussed in the section above dealing with causation, PHS's actions in hiring McCauley, even if otherwise actionable, simply did not result in any damages to Maxxim. The business that was subsequently lost by Maxxim was lost due to Maxxim's failures in losing the Novation contract, its inability to adequately service its customers, and its own financial condition leading to a Chapter 11 filing. These factors were totally independent of any actions taken by either PHS or McCauley. Accordingly, Maxxim has failed to prove damages with respect to this claim.

### 2) Tortious Interference with Hospital Business Relationships by PHS and McCauley

 In this portion of Count V, Maxxim asserts that both PHS and McCauley tortiously interfered with Maxxim's business relationships with the hospitals that were McCauley's customers while she was employed by Maxxim. Under Florida law, the elements of tortious or intentional interference with a business relationship are: (i) the existence of a business relationship; (ii) the defendant's knowledge of the business relationship; (iii) an intentional and unjustified interference with the relationship by the defendant; and (iv) damage to the plaintiff as a result of the breach of the relationship.[205] The principal elements of

---

to breach the contract; therefore, the party to the contract was not induced to breach the contract by the defendant) (quoting *Cedar Hills Prop. Corp. v. Eastern Fed. Corp.*, 575 So.2d 673, 676 (Fla. 1st DCA 1991)).

**202.** See *Royal Servs., Inc. v. Williams*, 334 So.2d 154 (Fla. 3d DCA 1976) (absent evidence that the present employer influenced or exercised any control in regard to the decision of the former employer to terminate his employment, it was not liable for any tortious interference with the employer-employee contractual relationship).

**203.** *Martin Petroleum Corp. v. Amerada Hess Corp.*, 769 So.2d 1105 (Fla. 4th DCA 2000) (affirming summary judgment for defendant in tortious interference case, where defendant did not induce any breach); *Royal Servs.*, 334

So.2d 154 (affirming judgment in favor of defendant in action for tortious interference with a restrictive covenant where the defendant did not induce the employee to leave his employment).

**204.** *Motorola, Inc. v. Fairchild Camera & Instrument Corp.*, 366 F.Supp. 1173, 1180 (D.Ariz.1973). *See also Yiakas v. Savoy*, 26 Mass.App.Ct. 310, 526 N.E.2d 1305, 1309 (1988) ("[a] competitor may 'interfere' with another's contractual expectancy by picking the deal off for himself, if, in advancing his own interest, he refrains from employing wrongful means.").

**205.** 32 Fla. Jur. 2d *Interference* § 7 (2005). *See also IBP, Inc. v. Hady Enterp., Inc.*, 267 F.Supp.2d 1148, 1164 (N.D.Fla.2002); *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647

this tort that Maxxim has failed to prove are discussed below.

### a) Existence of Business Relationship.

As a general rule, an action for the tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement that in all probability would have been completed if the defendant had not interfered with it.[206] As the Florida Supreme Court recognized in *Ferguson Transportation, Inc. v. North American Van Lines, Inc.,* 687 So.2d 821 (Fla.1996), "an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."[207] Here, Maxxim presented no evidence of any "actual identifiable understanding or agreement which in all probability would have been completed" absent Defendants' actions.

A speculative hope of future business is not sufficient to sustain the tort of interference with a business relationship.[208] As discussed above, although Maxxim once had a business relationship with certain hospitals in Maine for the supply of CPTs, the hospitals ceased to do business with Maxxim for reasons independent of any actions attributable to the Defendants.

### b) Intentional or Unjustified Interference with Business Relationship

This element requires that the plaintiff show that the defendant acted with malice or ill will. In addition, the interference must be direct, and not an indirect consequence of the defendant's action.[209] "The only way that malice can be proven in the absence of direct evidence is by proving a series of acts which, in their context or in light of the totality of the circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill will, or other bad motive." [210]

PHS did not intentionally interfere with any of Maxxim's business relationships. PHS did not enter the Maine market with the intent to sabotage Maxxim's CPT business. PHS began soliciting the business from hospitals in Maine after it was awarded the Novation contract and was encouraged by Novation to service Novation clients. PHS acted in good faith by serving Novation's customers and did so to

---

So.2d 812, 814 (Fla.1994); *Sobi v. Fairfield Resorts, Inc.* 846 So.2d 1204, 1207 (Fla. 5th DCA 2003); *Chicago Title Ins. Co. v. Alday–Donalson Title Co. of Florida, Inc.,* 832 So.2d 810, 814 (Fla. 2d DCA 2002); *Seminole Tribe of Florida v. Times Publ'g Co., Inc.,* 780 So.2d 310, 315 (Fla. 4th DCA 2001); *Martin Petroleum,* 769 So.2d at 1107 (recognizing that Florida follows the Restatement (Second) Torts § 764 for this cause of action).

206. *Ethan Allen,* 647 So.2d 812; *St. Johns River Water v. Fernberg Geological Servs., Inc.,* 784 So.2d 500, 504 (Fla. 5th DCA 2001).

207. *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.,* 687 So.2d 821, 822 (Fla.1996)

(citing *N. Am. Van Lines v. Ferguson Transp., Inc.,* 639 So.2d 32, 33–34 (Fla. 4th DCA 1994) ("At trial Ferguson was unable to bring forth a single customer who would have patronized Ferguson but for the interference by North American.")).

208. *St. Johns River Water Management Dist.,* 784 So.2d 500.

209. *IBP,* 267 F.Supp.2d at 1165 (relying on *Lawler v. Eugene Wuesthoff Mem. Hosp. Ass'n,* 497 So.2d 1261, 1263 (Fla. 5th DCA 1986)).

210. *Rockledge Mall Assocs., Ltd. v. Custom Fences of S. Brevard, Inc.,* 779 So.2d 554, 557 (Fla. 5th DCA 2001).

promote its own business. PHS did not sabotage Maxxim's business. PHS never acted with malice.

### c) Damages

■■■ Again, as with all of Maxxim's claims for monetary relief, Maxxim cannot show that it was damaged by PHS's actions in soliciting the hospital customers in Maine. Rather, the business that was lost by Maxxim was lost due to Maxxim's failures in losing the Novation contract, inability to adequately service its customers, and its own financial condition leading to its Chapter 11 filing. These factors were totally independent of any actions taken by either PHS or McCauley. Accordingly, Maxxim has failed to prove damages with respect to this claim.

### e. Count VI (PHS and McCauley)— Uniform Trade Secrets Act

Count VI of the complaint is for violation of the Uniform Trade Secrets Act ("UTSA"). In this regard, Maxxim alleges that both PHS and McCauley had access to confidential and proprietary Maxxim product and design specifications and contractual information. Maxxim further alleges that this information constituted trade secrets protected by the UTSA[211] and that Defendants misappropriated these trade secrets causing Maxxim to suffer pecuniary loss.[212]

■■■ As a threshold matter, in order to sustain an action under the UTSA, Maxxim must prove that the information that it contends was misappropriated constitutes a "trade secret" under the UTSA. To meet this burden, Maxxim must prove that (1) the information "not generally known" by others who might profit from its use or disclosure; (2) the information was "not readily ascertainable" by that same class of persons; and (3) the information was subject to "reasonable" efforts under the circumstances to maintain its secrecy.[213] In addition, as with Maxxim's other claims for relief, Maxxim must prove that the alleged violation of the UTSA caused it damages.

### 1) Information Must be Not Generally Known.

■■■ To be a trade secret, the information sought to be protected must truly be "secret." If the information is necessarily disclosed upon use by a third party, the information cannot qualify as a trade secret.[214] And information that is public knowledge or that is generally known in an industry cannot be a trade secret.[215]

---

211. Fla. Stat. § 688.002(4) (2005).

212. Compl., p. 84.

213. See Gary S. Gaffney & Maria E. Ellison, *A Primer on Florida Trade Secret Law: Unlocking the "Secrets" to "Trade Secret" Litigation*, 11 U. Miami Bus. L. Rev. 1, 11–12 (Winter/Spring 2003). See also *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407 (11th Cir.1998) (applying Florida law).

214. *Northup v. Reish*, 200 F.2d 924, 928 (7th Cir.1953) (where plaintiff had developed a unique oven liner and filed an action against defendant for wrongful use, a judgment for the plaintiff was reversed because "simple use" of the product revealed its design);

*Sandlin v. Johnson*, 152 F.2d 8, 11 (8th Cir. 1945) (where plaintiff designed a poultry picking machine and attempted to recover from defendant for wrongful use, the Court affirmed a judgment in favor of defendant, noting that the design of the machine was readily apparent upon inspection and noting that "[m]atters which are completely disclosed by the goods which one markets cannot be his secret." (quoting Restatement Torts, § 757 cmt b, *Secrecy*)).

215. *Ruckelshaus v. Monsanto, Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); see also *Nilssen v. Motorola, Inc.*, 963 F.Supp. 664, 675 (N.D.Ill.1997) (information that is generally known within an industry is not trade secret material).

At trial, there was abundant evidence that the hospitals determine both tray contents and design. Tray contents are identified in bills of materials, which the hospitals can use without restriction. Likewise, as the custom procedure trays are unpacked, their design is obvious to the user. There are no restrictions on the end user's subsequent use of any design.

### 2) Information Must Not Be Readily Ascertainable.

 Information that is *readily ascertainable* by proper means by a person who can obtain economic value from its disclosure or use cannot qualify for trade secret protection.[216] This concept is inextricably intertwined with the issue of whether information derives independent value from being secret.[217] Obvious designs have no value and are readily ascertainable.[218] Maxxim's own witnesses testified that tray contents are "readily ascertainable." This testimony dooms their trade secret case.[219]

### 3) Efforts to maintain secrecy

 In any trade secret action, the claimant bears the burden of proof of demonstrating that the claimant took reasonable efforts to maintain secrecy.[220] Disclosure of information to others who are under no obligation to protect the confidentiality of the information defeats any claim that the information is a trade secret.[221]

**216.** *See generally MacPherson's Inc. v. Windermere Real Estate Servs. Co.*, 100 Fed.Appx. 651, 654 (9th Cir.2004) (applying Georgia law and finding that information that is sufficiently easy for an interested competitor to discover cannot be protected as trade secrets); *Bestechnologies, Inc. v. Trident Envtl. Sys., Inc.*, 681 So.2d 1175, 1176 (Fla. 2d DCA 1996).

**217.** Gary S. Gaffney & Maria E. Ellison, *A Primer on Florida Trade Secret Law: Unlocking the "Secrets" to "Trade Secret" Litigation*, 11 U. Miami Bus. L. Rev. 1, 11–12 (Winter/Spring 2003). *See also Alan Scott, D.C., P.A. v. Moses, D.C.*, 712 So.2d 1242, 1243 (Fla. 4th DCA 1998) (finding a chiropractor's patient list could not be classified as a trade secret because the claimant failed to submit substantive evidence to establish that the information on the list could not be obtained by other means); *Sethscot Collection, Inc. v. Drbul*, 669 So.2d 1076, 1078 (Fla. 3d DCA 1996) (holding that a clothing retailer's prospective customer list was not a trade secret because it was compiled from information which was readily ascertainable to the public using commercially available sources); *Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288, 289–90 (Fla. 2d DCA 1989) (finding that a customer list was not a trade secret because it could be derived from publications); *Blackstone, D.O., P.A. v. Dade City Osteopathic Clinic*, 511 So.2d 1050, 1051–52 (Fla. 2d DCA 1987) (finding that the claimant's failure to produce evidence that the

names on its patients list could not be obtained by other means was fatal to his trade secret claim).

**218.** Restatement (Third) Unfair Competition § 42 cmt. f. *See also Sethscot Collection*, 669 So.2d at 1078 (finding a clothing retailer's prospective customer list containing names of 9,600 social fraternities and sororities was not a trade secret entitled to injunctive protection preventing former employee from using the list to compete with retailer; list was compiled from information readily ascertainable to the public from commercially available materials).

**219.** *See, e.g., Hutchison v. KFC Corp.*, 883 F.Supp. 517, 521 (D.Nev.1993) (rejecting claim that process of skinning and cutting chicken parts to create a skinless fried chicken product was a trade secret because "[i]f the subject matter of a trade secret is obvious and not a secret, then there can be no trade secret") (citations omitted).

**220.** *Am. Red Cross*, 143 F.3d at 1410 (finding that under Florida law, the claimant in a trade secret action bears the burden of demonstrating that the information it seeks to protect is a trade secret and that reasonable steps have been taken to protect its secrecy).

**221.** *Ruckelshaus*, 467 U.S. at 1002, 104 S.Ct. 2862. *See also Cubic Transp. Sys., Inc. v.*

In this action, it is apparent that Maxxim and Medline took no efforts to maintain the alleged secrecy of the tray contents and design. As outlined above, neither the trays nor the bills of material were ever marked confidential and there were no restrictions placed on the hospital's distribution of trays or bills of material. And there is no evidence that Maxxim ever advised anyone (pre-litigation) that it believed that tray contents and design were their trade secret. The fact that Maxxim took no measures to protect this alleged secret demonstrates that Maxxim never had such a belief and that Maxxim never considered this information to be "secret."

### 4) Damages

██ Here again, as with all of Maxxim's claims for monetary relief, Maxxim cannot show that it was damaged by PHS's actions even if Maxxim were to show that the tray contents and design were trade secrets. Rather, any alleged damages resulting from Maxxim's loss of the Maine resulted from Maxxim's own failures in losing the Novation contract, its inability to adequately service its customers, and its own financial condition leading to a Chapter 11 filing. These factors were totally independent of any actions taken by either of PHS or McCauley. Accordingly, Maxxim has failed to prove damages with respect to this claim.

### f. Count VII (PHS and McCauley)— Unfair Competition

Count VII of the complaint is for unfair competition. In summary, Maxxim contends that PHS and McCauley intentionally harmed Maxxim by soliciting its customers and by using confidential and proprietary information and that these acts constitute unfair competition under the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA") causing Maxxim to suffer pecuniary loss.[222] In considering this claim for relief, the Court must determine whether (1) the FDUTPA applies to the actions of PHS and McCauley, (2) if the FDUTPA does apply, whether Maxxim has proven a claim for relief under this statute, and (3) whether Maxxim sustained any damages as a result of the alleged violations.

### 1) The FDUTPA Does Not Apply

Under the FDUTPA, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.[223] In essence, the FDUTPA is a consumer protection statute intended to modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices. It is intended to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.[224] It is also intended to make state consumer protection and enforcement consistent with estab-

---

*Miami–Dade County*, 899 So.2d 453, 454 (Fla. 3d DCA 2005) (holding that by failing to mark documents provided to the county "confidential," the corporation did not protect the secrecy of such documents allegedly containing trade secrets); *Sepro Corp. v. Florida Dept. of Env't Prot.*, 839 So.2d 781, 784 (Fla. 1st DCA 2003) (finding that the trade secret owner who fails to label a trade secret as such, or otherwise fails to specify in writing that such

information is confidential, has not taken measures or made efforts that are reasonable under the circumstances to maintain the information's secrecy).

**222.** Compl., p. 89.

**223.** Fla. Stat. § 501.204(1) (2006).

**224.** Fla. Stat. § 501.202.

lished policies of federal law relating to consumer protection.[225]

Although the FDUTPA may extend to protect business entities from unfair and deceptive trade practices, the FDUTPA has no application to entities complaining of tortious conduct which is not the result of a consumer transaction.[226] Courts have interpreted "consumer" to mean one engaged in the purchase of goods or services.[227] In this case, Maxxim has no standing to maintain a claim against Defendants under the FDUTPA because Maxxim was not acting as a consumer or purchaser of goods or services in its dealings with PHS and McCauley.

### 2) PHS's and McCauley's Actions Do Not Violate The FDUTPA

Even if Maxxim has standing to bring a claim under the FDUTPA, its claim must fail because the Defendants' conduct was neither offensive to established public policy, nor immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. As discussed in the Court's analysis of the other counts contained in the Complaint, there was nothing confidential or proprietary about the information regarding Maxxim's business in Maine. Nor was there anything inappropriate about the manner in which PHS came to employ McCauley. Under no circumstances do their actions rise to the level of a violation of the FDUTPA.

### 3) Damages

Here again, as with all of Maxxim's claims for monetary relief, Maxxim cannot show that it was damaged by PHS's actions. Rather, any alleged damages resulting from Maxxim's loss of the Maine business resulted from Maxxim's own failures in losing the Novation contract, its inability to adequately service its customers, and its own financial condition leading to a Chapter 11 filing. These factors were totally independent of any actions taken by either PHS or McCauley. Accordingly, Maxxim has failed to prove damages with respect to this claim.

### g. Count VIII (PHS and McCauley)— Violation of Automatic Stay

Count VIII of the Complaint is for violation of the automatic stay. In this count, Maxxim alleges that both PHS's and McCauley's actions, as described

---

**225.** *Id.*

**226.** Maxxim has conceded this point. *See* Maxxim's Proposed Conclusions of Law ¶ 98 (*citing Spiegel, Inc. v. Federal Trade Comm.,* 540 F.2d 287, 293 (7th Cir.1976) (the Court found that a practice was "unfair" under the federal statute when it "offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers). *Burger King Corp. v. H & H Rest., LLC,* 2001 WL 1850888 at *9, 2001 U.S. Dist. LEXIS 24038 at *27 (S.D.Fla. Nov. 30, 2001).

**227.** *S & B Inv., LLC v. Motiva Enter., L.L.C.,* 2004 WL 3250306 at *5–6, 2004 U.S. LEXIS 27502 at *18 (S.D.Fla. Dec. 6, 2004) (finding that plaintiff had standing to bring a claim under the FDUTPA because it was in the process of purchasing a franchise from the defendant, not goods or services); *Burger King Corp. v. Ashland Equities, Inc.,* 161 F.Supp.2d 1331, 1338 (S.D.Fla.2001) (finding that plaintiffs who owned and operated several restaurants pursuant to franchise agreements with defendant and who claimed that defendant interfered with the sale of the franchised restaurants to a third party were not "consumers" entitled to protection under the FDUTPA because they were selling, not purchasing the restaurant); *N.G.L. Travel Assoc. v. Celebrity Cruises Inc.,* 764 So.2d 672, 674 (Fla. 3d DCA 2000) (finding that travel agencies were not consumers entitled to protection under the FDUTPA because they provided services to cruise lines rather than purchased services from them).

above, constituted acts to obtain possession or exercise control of property of Maxxim's bankruptcy estate. In this count, Maxxim does not seek damages. Rather, it seeks a declaratory judgment that PHS has violated the automatic stay.

The specific Bankruptcy Code section to which Maxxim refers with respect to this count is section 362(a)(3), which provides that the filing of a bankruptcy case operates as a stay of "any act to obtain possession of property of the estate or ... to exercise control over property of the estate...." [228] The "property of the estate" that Maxxim contends is protected by this section is the "goodwill of the Debtor's business, including Maxxim's relationships with its employees and customers." [229]

Even assuming that Maxxim's goodwill and customer relationships are protected by the automatic stay, as discussed in detail above, it is clear that Maxxim's own actions caused it to lose any goodwill or customer relationships it may have at one time enjoyed in McCauley's sales area. Loss of this goodwill and these customer relationships resulted from Maxxim's own failures in losing the Novation contract, its inability to adequately service its customers, and its own financial condition leading to a Chapter 11 filing. These factors were totally independent of any actions taken by either of PHS or McCauley. Accordingly, the actions of the Defendants in no way affected the property of Maxxim's bankruptcy estate.

### 3. Injunctive Relief

The Complaint in this action seeks injunctive relief "to prevent further violation of the automatic stay and irreparable harm to Maxxim by virtue of Defendants' unlawful conduct...." [230] As discussed above, Maxxim has failed to prove the elements of any of its claims for relief for damages. In addition, while the Court has found that McCauley was party to a version of the SRA that contained a covenant not to compete, the Court has also already concluded that Maxxim has failed to prove the existence of one or more legitimate business interests justifying the enforcement of its covenant not to compete in this case. [231]

■ However, even if the Court had concluded that the covenant not to compete contained in McCauley's SRA was valid and binding, injunctive relief against McCauley would still not be appropriate under the circumstances. In reaching this conclusion, the Court notes that the term of McCauley's covenant not to compete was for one year's duration, commencing upon McCauley's termination of her employment in June of 2003. Accordingly, the period for any injunction arising from the covenant not to compete had long expired before this case came to trial.

In considering whether injunctive relief would ever be appropriate in this case, the Court notes that Maxxim never sought a preliminary injunction in this case. Rather, it has waited until the conclusion of a lengthy trial to seek this extraordinary relief. The trial in this case concluded approximately three years after the acts occurred that form the basis of the request for injunctive relief. Given this set of circumstances, any action for an injunction has become moot. [232] for example, in *Insur-*

**228.** 11 U.S.C. § 362(a)(3).

**229.** Compl. ¶ 94.

**230.** Compl. ¶ 1.

**231.** Fla. Stat. § 542.335(1)(b).

**232.** *See, e.g., Ins. Field Servs., Inc. v. White & White*, 384 So.2d 303 (Fla. 5th DCA 1980), in which the Florida Supreme Court stated, "[S]ince August 1, 1979, [the date of expiration for the covenant not to compete,] has passed that portion of the final judgment which enjoined [the defendant] ... from com-

*ance Field Services,* the two-year period in the covenant not to compete had expired months before the court's opinion. The Florida Supreme Court did not extend the covenant term even though the employee-defendant had started competing in earnest with the employer-plaintiff at least a month before leaving his employment.[233]

Similarly, where an eighteen-month covenant period lapsed six months before the appellate court rendered its opinion, a lower court stated, "It would be contrary to those considerations of the parties, and to the terms of the contract, to now require [the defendant] to observe the non-compete provision of the contract in the future for 18 months or for any part thereof.... The agreed period for the non-competition expired months ago."[234] Finally, in a more recent case from Florida, the Court of Appeal for the First District summarily dismissed an injunction action as moot, citing with approval *Insurance Field Services* for the holding that an injunction to enforce a covenant against competition becomes moot after the contracted-for covenant period expires by its terms.[235]

As discussed at length above, it was Maxxim's own failures that resulted in the loss of its Maine business. Accordingly, given the foregoing case law, even if there were a valid and enforceable covenant not to compete in this case, the Court would not consider it appropriate to grant injunctive relief under the facts of this case.

## III. Conclusion

As set forth above, the Court finds that even though McCauley knowingly violated her covenant not to compete in going to work for PHS, at the end of the day,

Maxxim suffered no damages as a result of McCauley's actions. That is, the loss of the Maine business by Maxxim was due to the poor quality of Maxxim's services and goods, the loss of a key group purchasing contract, and the filing of its Chapter 11. Neither PHS nor McCauley were in any way responsible for these factors. It was Maxxim's own failures rather than any action by PHS or McCauley that resulted in the loss of the CPT business in Maine by Maxxim.

Accordingly, for the reasons set forth above, the Court will enter a separate final judgment in favor of the Defendants.

DONE AND ORDERED.

---

peting with appellee until that date has become moot." *Id.* at 306.

**233.** *Id.* at 303–05.

**234.** *Royal Servs.,* 334 So.2d at 157.

**235.** *Woodring v. Wise Microcomputer Solutions, Inc.,* 838 So.2d 1241 (Fla. 1st DCA 2003).